IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene J. Cofsky,<br><br>                    Petitioner,<br><br>vs.<br><br>Dora B. Schriro, et al.<br><br>                    Respondents. | No. CV-07-8126-PHX-FJM (LOA)<br><br>**REPORT AND RECOMMENDATION** |

        This matter arises on Petitioner's Petition for Writ of Habeas Corpus by Person in State Custody Pursuant to 28 U.S.C. § 2254.  (docket # 1)  Respondents have filed an Answer (docket # 10) to which Petitioner has replied.[1]  (docket # 14)  The Court subsequently ordered supplemental briefing, which the parties recently filed.  (dockets # 19, 20)  Additionally, the State has submitted the entire transcript of Petitioner's state trial.  (docket # 16)

**I. Procedural History**

        **A.  Factual Background, Charges, Trial and Sentence**

        The following events gave rise to Petitioner's challenged conviction and sentence.  In May 2000, David Goldberg and Dennis Schilinski were prisoners in the Mohave County Jail.  (Petitioner's Exh. C)  Robert Olsen, an inmate in the adjoining cell, befriended

_____

        [1] Petitioner filed his Petition (docket # 1) *pro se*.  Petitioner filed his reply and subsequent pleadings with the assistance of counsel.

Goldberg.  (Tr. 1/10/01 at 86–87, 89–91[2]) Goldberg was a co-defendant with Petitioner, Eugene Cofsky and his wife Sheri Cofsky in another case. (Tr. 1/11/01 at 139; Tr. 1/18/01, at 86; Tr. 1/19/01, at 67–68)  The Cofskys, however, were out on bond.  Olsen repeatedly overheard Goldberg discussing a plan to break out of jail. (Tr. 1/10/01 at 91, 107)  The plan involved intercepting Goldberg while he was being returned to jail following his court appearance scheduled before Judge Steven F. Conn at 11:30 a.m. on June 12, 2000 at the Mojave County Superior Court in Kingman, Arizona.[3]

According to the plan, Goldberg would be picked up in a van with sliding doors so that Goldberg, who would be chained, could "hop in." (Tr. 1/10/01 at 103–04, 113–14, 163–64)  Once inside the van, Goldberg would "cut off his chains,""change his clothes," and then drive to a Carl's Jr. restaurant, where another car was "waiting," and "switch"vehicles. (*Id.*)  Goldberg would drive to Lake Havasu, "hide there for a week to two weeks" at a public campground, then travel to Mexico and ultimately Australia.  (*Id.*)

The plan included a contingency that, if the guard escorting Goldberg attempted to thwart the escape, Dennis Schilinski would "kill the guard" by "shoot[ing]" him. (*Id*. at 93–94, 97, 130)  In exchange, Schilinski would receive "a large sum of money."  (*Id.* at 130) Goldberg also told Olsen that several others were involved in the plan, including "Gene [Cofsky], Ron [Manning], [and] Gene's wife [Sheri Cofsky]." (*Id.* at 99)  Goldberg told Olsen that "Gene" or "Eugene" Cofsky was his "business partner and friend." (*Id.* at 99-100)  Goldberg discussed his plan with Olsen on a "daily basis," between "30 and 60 times." (*Id.* at 94, 98–99, 107)

---

[2] Citations to "Tr. ___" are to the transcripts from Petitioner's trial which are attached to Respondents' Supplemental Exhibits to Answer to Petition for Writ of Habeas Corpus (docket # 16).

[3] The courthouse was across the street from the jail, and inmates walked to and from the courthouse for court appearances escorted by a correctional officer. (Tr. 1/10/01 at 199–204).

1  Olsen initially thought that Goldberg was "bragging," but as "days went on" Olsen

2  realized that the plan was "very serious." (Tr. 1/10/01 at 94, 98)  Concerned that the

3  conspirators were "going to kill a guard" during the escape attempt, Olsen wrote a letter to

4  his drug-therapy counselor describing Goldberg's plan.  (*Id.* at 104–09, 120–24, 164) About

5  a week before the planned escape attempt, Schilinski was transported to the Clark County

6  Detention Center in Las Vegas, Nevada, where he had outstanding traffic warrants.  (Tr.

7  1/10/01 at 102; Tr. 1/11/01 at 7–12)  Goldberg told Olsen that "Gene" Cofsky had paid

8  Schilinski's fines and taken him to Cofsky's ranch, where he would stay until the jailbreak.

9  (Respondents' Exh. FF at 103) Goldberg explained that they "didn't want to lose track of

10  [Schilinski] because he was a key figure in this." (*Id.*)

11  Meanwhile, after Schilinski was transported to the Clark County Detention Center in

12  Las Vegas, but before Cofsky had paid his fines to get him released, Schilinski told fellow

13  inmate Daniel England about the planned escape attempt.  (Tr. 1/11/01 at 7–13) Specifically,

14  Schilinski told England that he had to "go break somebody out of jail" on "Monday at 11:30

15  on the 12th of June," just five days away, and to "watch the six o'clock news" that day. (*Id.*

16  at 11, 13–15)  Schilinski also told England that the person's name was "Dave" Goldberg.

17  (*Id.*)  Schilinski explained that a van with "two" people in it was going to pull over and

18  "grab" Goldberg as he was being transported "from the court back to the jail" in Kingman,

19  Arizona. (Tr. 1/11/01 at 16–19, 31, 33, 54–55, 69, 81–82, 91, 94)  Schilinski was going to

20  tell the guard, "don't be a cowboy," and if he did anything or "made a move," he was going

21  to "shoot him." (*Id.* 17, 54)  Then they planned to "switch cars," and eventually travel to

22  Australia. (*Id.* at 17-19) A person named "Eugene" (Cofsky) was responsible for the

23  "placement of the vehicles." (*Id.*)  Schilinski told England that Goldberg was going to pay

24  him $150,000 for his participation. (*Id.* at 18)  England alerted Las Vegas Police about the

25  planned escape attempt. (*Id.* at 21–26)

26  On June 8, 2000, the Las Vegas Police Department contacted the Mohave County

27  Detention Center and advised officials of the planned jailbreak, including the names of

28  several of the known conspirators— (1) "Dave" (Goldberg); (2) "Schilinski"; (3) "Eugene,"

1  with a last name that "ended in a "ski-sounding word" (Eugene Cofsky); and (4) "Cheryl"

2  (Sheri Cofsky).  (Tr. 1/11/01 at 90–93, 98, 134–41)  Mohave County jail officials verified

3  Goldberg's status as an inmate at the jail and that he had a court appearance scheduled for

4  June 12, 2000 at 11:30 a.m. at the Mohave County Courthouse. (*Id.*) They also verified

5  Schilinski's status as a former inmate and his relationship with Goldberg.  (Tr. 1/11/01 at

6  140-44)  Officials discovered that Eugene and Sheri Cofsky were identified as codefendants

7  in Goldberg's case. (*Id.*)  After obtaining the foregoing information, Mojave County Jail

8  officials contacted the Mohave County Sheriff's Department.  (Tr. 1/11/01 at 134-41)

9       That weekend, the Mohave County Sheriff's Deparment, the Federal Bureau of

10  Investigation, and the Arizona Department of Public Safety, set up surveillance at the

11  Cofsky residence, approximately 13 miles outside of Kingman, and throughout Kingman's

12  city limits, particularly the Mohave County Courthouse and the Mohave County Detention

13  Center. (Tr. 1/11/01 at 173–79; Tr. 1/12/01, at 6–7, 16, 125–30, 138–40; Tr. 1/17/01, at

14  17–24, 117–19, 234–37; Tr. 1/18/01 at 13–17, 49–59)  At approximately 6:00 p.m. on June

15  11, 2000, officers saw co-defendants Tracy Date and Tawanee Barrett arrive together at the

16  Cofsky residence in a black Mercury Mountaineer.  (Tr. 1/12/01 at 130–35; Tr. 1/19/01 at

17  56–58; Tr. 1/23/01, at 4–7)  Officers also noticed a silver-blue Dodge Caravan minivan

18  parked at the Cofsky residence. (Tr. 1/19/01 at 58)

19       At approximately 9:00 a.m. the next morning, Eugene and Sheri Cofsky arrived at

20  the Cofsky residence in a red pickup truck.  (Tr. 1/11/01 at 180; Tr. 1/12/01 at 149; Tr.

21  1/23/01 at 21)  At around 10:00 a.m., officers observed Date, Barrett, and co-defendant

22  Ronald Manning leave the Cofsky residence in the Mountaineer and drive to a Wal-Mart

23  store in Kingman.  (Tr. 1/12/01 at 143–49,167–70; Tr. 1/17/01 at 245–48; Tr. 1/18/01 at

24  19–23; Tr. 1/23/01 at 22–25)  Date, Barrett, and Manning purchased .38 caliber ammunition

25  at Wal-Mart.  (Tr. 1/12/01 at 167-70; Tr. 1/23/01 at 22-25)  They then drove to Auto Zone

26  and bought a pair of 18-inch bolt cutters. (*Id.*)   They then returned to the Cofsky residence.

27  (*Id.*)

28

At approximately 11:00 a.m., law enforcement officers observed all three vehicles—the pickup truck, the minivan, and the Mountaineer—leave the Cofsky residence and drive to Kingman. (Tr.1/11/01 at 185–90, 194; Tr. 1/12/01 at 150–53, 177)  Date and Barrett were driving the Mountaineer, Manning was driving the minivan, and the Cofskys were driving the pickup truck. (Tr. 1/23/01 at 29–30, 45–46)  Officers followed the vehicles into Kingman, and watched them drive to an old warehouse parking lot. (Tr. 1/12/01 at 154–55; Tr. 1/23/01 at 30)  At the warehouse parking lot, Date and Manning removed the minivan's back seat and left it behind the building. (Tr. 1/11/01 at 195; Tr. 1/23/01 at 30) Date, Barrett, and Manning then drove to a parking lot at Arnold Plaza where Barrett backed the Mountaineer into a parking space and parked.  (Tr. 1/11/01 at 161-63; Tr. 1/23/01 at 30-31)  Barrett remained in the Mountaineer.  Date and Manning left in the minivan and headed towards the courthouse.  (Tr. 1/17/01 at 118-19, 125-26; Tr. 1/18/01at 59-64; Tr. 1/23/01 at 30-31)  Meanwhile, the Cofskys drove to the courthouse and parked on the street in front of the courthouse.  (Respondents' Tr. 1/12/01 at 30) Around this same time, officers observed Schilinski arrive in a white Pontiac Trans Am[4] and park in a parking lot located between the courthouse and the jail. (Tr. 1/17/01 at 25-31, 238-41; Tr. 1/18/01 at 61-62) Schilinski exited the vehicle, and began "looking all about, up and down the street in all different directions" in a "paranoid fashion." (*Id.*)  Schilinski then walked around the courthouse, got back into the Trans Am, and drove away.  (Tr. 1/17/01 at 240)  Schilinski returned "[s]everal minutes later," parked in the same parking lot, and went inside the jail's administration office.  (*Id.* at 240-41)  Schilinski then returned to his vehicle and left. (*Id.*) Shortly thereafter, officers saw Schilinski return to the courthouse, still "very, very nervous, looking around," and "scanning the area." (Tr. 1/17/01 at 120-24)  Schilinski entered the courthouse, "rushed through" the security checkpoint, and proceeded to the elevators. (Tr. 1/12/01 at 18-25)  An undercover officer followed Schilinski and got on the elevator with

---

[4]  The white Trans Am had been reported stolen earlier that morning in Laughlin, Nevada. (Tr. 1/17/01 at 72-73).

1   him. (*Id.* at 19)  Schilinski "blurted out . . . they don't like it when you're late," and stated

2   that he was expected in court.  (*Id.*)  The officer asked Schilinski which courtroom he was

3   looking for, and Schilinski told him, "Judge Conn's courtroom." (*Id.* at 19-21)  Schilinski

4   then asked the officer if he was a "cop." (Tr. 1/12/01 at 20)  The officer identified himself

5   as a police officer and asked Schilinski his name. (*Id.*)  Schilinski replied, "Dave Hausen."

6   (*Id.*)  Once at Judge Conn's courtroom, Schilinski approached the doors, "leafed through the

7   court calendar," and then left. (*Id.* at 21-22)  The undercover officer looked at the court

8   calendar, and noticed that Goldberg was scheduled to appear before Judge Conn at 11:30

9   a.m. (*Id.* at 22-23)  Schilinski's name was not on the calendar. (*Id.* at 22)  After Schilinski

10  left the courthouse, the undercover officer observed the Cofskys enter the courthouse and

11  proceed to Judge Conn's courtroom. (*Id.* at 25-29, 74-75)  Several minutes later, Eugene

12  Cofsky left the courtroom, made a brief phone call on a nearby pay phone, and then

13  reentered the courtroom.  (Tr. 1/12/01 at 27-29)  Both Eugene and Sheri Cofsky then left the

14  courtroom, and walked out of the courthouse, where they were immediately arrested. (*Id.*)

15  Police discovered $10,700 in Eugene Cofsky's pants pocket. (*Id.* at 31)  Police also found a

16  day planner in Sheri Cofsky's purse that contained Schilinski's name, social security

17  number, and date of birth; Manning's name and phone number; and the name, "Tracy"

18  (Date), with a corresponding telephone number.  (*Id.* at 31–35)  Officers searched the

19  Cofskys' pickup truck parked outside the courthouse, and found a set of California license

20  plates, which were not registered to the Cofskys.  (Tr. 1/17/01 at 181–83, 190)  Police

21  subsequently found Schilinski and arrested him.  (Tr. 1/18/01 at 68–69)  Meanwhile,

22  officers outside the courthouse observed the silver-blue minivan drive "right in front" of the

23  courthouse. (Tr. 1/11/01 at 160-61, 193-94; Tr. 1/17/01 at 125-29; Tr. 1/18/01 at 62-65)

24  Believing the conspirators "were going to be carrying out their plan," officers stopped the

25  minivan, and ordered Date and Manning to exit the vehicle.  (Tr. 1/11/01 at 160-61, 167; Tr.

26  1/17/01at 125-32, 242-43; Tr. 1/18/01 at 62-69)  Manning was in the driver's seat, and Date

27  was crouched in the "back cargo area" of the van. (Tr. 1/17/01 at 129-32, 244; Tr. 1/18/01 at

28  66)  Date was wearing "reflective sunglasses," had seven .38 caliber rounds of ammunition

1  in his pocket, and was holding six more rounds in his hand. (Tr. 1/17/01 at 41-42, 131;Tr.

2  1/18/01 at 66)  Officers discovered two handguns in the van, one loaded with two .38 caliber

3  rounds of ammunition, and a pair of worn surgical gloves. (Tr. 1/17/01 at 132-35, 172-81;

4  Tr. 1/18/01 at 67)  Police arrested Date and Manning and took them into custody. (Tr.

5  1/17/01 at 133, 244; Tr. 1/18/01 at 11)  Officers then detained the Mountaineer, which was

6  still parked at Arnold Plaza, and arrested Barrett. (Tr. 1/11/01 at 161-67; Tr. 1/12/01 at 157)

7  Inside the Mountaineer, officers discovered: (1) two pairs of bolt cutters; (2) five .38 caliber

8  rounds of ammunition; (3) a pair of plastic gloves similar to the pair found in the minivan;

9  (4) a bag containing "extra large" men's clothing and a can of shaving cream;[5] (5) cell

10 phones; (6) two license plates; and (7) a court document bearing Eugene Cofsky's name.

11 (Tr. 1/17/01 at 143-162, 223; Tr. 1/18/01 at 70-73, 87) The Nevada license plate on the back

12 of the Mountaineer was covered with a California license plate that was not registered to any

13 of the conspirators. (Tr. 1/17/01 at 142,144-45, 188-191) Officers also searched the Cofsky

14 residence and found: (1) $117,500 in cash; (2) a document bearing Eugene Cofsky's name

15 which included the notation,"left Fourth, end, park van, white Grand Am"; (3) .38 caliber

16 shell casings; and (4) a receipt from Wal-Mart for .38 caliber ammunition purchased on June

17 12, 2000 at 10:20 a.m. (Tr. 1/11/01 at 196–98; Tr. 1/12/01 at 37–41, 161–70)  A telephone

18 calling card taken from Schilinski after his arrest indicated that he called the Cofsky

19 residence at 8:28 a.m. on June 12, 2000. (Tr. 1/12/01 at 166)

20         Following his arrest, Manning waived his *Miranda* rights and agreed to be

21 interviewed by police. (Tr. 1/17/01 at 33–38)  Initially, Manning denied knowledge of a plan

22 to break Goldberg out of jail, but eventually admitted that he had "heard discussion about a

23 plan to break Goldberg out of jail," involving a person named "Dennis" (Schilinski). (*Id.*)

24 Manning admitted removing the minivan's back seat, but claimed that he did so because he

25 was picking up "building supplies." (*Id.*)

26

27 ────────────────

28    [5]  Goldberg weighed approximately 260 pounds and had a beard.  (Tr. 1/18/01 at 73)

1    Date also waived his *Miranda* rights and agreed to talk with police.  (Tr. 1/17/01 at

2    40–47; Tr. 1/18/01 at 30–33) Date told police that he had driven to Kingman with his

3    girlfriend, Barrett, from Utah that weekend to meet Manning, whom he had known for a

4    "couple of years."  (Tr. 1/17/01 at 40-47; Tr. 1/18/01 at 30-33) Date admitted that: (1) he

5    had been at the Cofskys' residence earlier that morning; (2) he helped Manning remove the

6    minivan's backseat; (3) the ammunition found in his pocket was the same as the ammunition

7    loaded in the handgun that was found in the minivan; and (4) he "handled" at least one of

8    the two handguns found in the minivan. (Tr. 1/18/01 at 30-33)  When asked why he and

9    Manning removed the seat from the van, Date became "upset and agitated" and "no longer

10    wanted to speak after that." (*Id.*)

11    Based on the foregoing, on June 22, 2000, the State of Arizona filed an indictment in

12    Mojave County Superior Court, charging Petitioner and each of his five co-defendants

13    (Dennis Schilinski, Sheri Cofsky, Ronald Manning, Tracy Date, and Tawanee Barrett[6]) with

14    one count of conspiracy to commit first degree murder, a class 1 felony (Count 1), and one

15    count of conspiracy to commit first degree escape, a class 4 felony (Count 2).

16    Codefendants Eugene Cofsky, Sheri Cofsky, Date, and Manning were tried together

17    before the Honorable Steven F. Conn.  (Respondents' Exh. BB)

18    Date was the only co-defendant who testified at Petitioner's trial.  Date testified that

19    he and Barrett had traveled to the Cofsky residence to do construction work with Manning.

20    (Tr. 1/17/01 at 3-7, 47)  Date stated that he was going to help with a septic system and

21    mentioned that the Cofskys were digging a pool.  (Tr. 1/23/02 at 48)  Date testified that

22    around 3:00 a.m. on June 12, 2000, he and Barrett drove to Wal-Mart to steal tools by hiding

23    them in suitcases.  (Tr. 1/23/01at 13-17)  He testified that he placed the suitcases containing

24    the tools by an emergency exit but he abandoned them when Barrett said she did not want to

25    be involved.  (Tr. 1/23/01 at 16-18)  He further testified that he covered the Nevada license

26

27      [6] The Court has spelled the conspirators names in the same manner as they appear in the

28    Indictment. (Respondents' Exh. A)  In the transcripts, however, Dennis Schilinski's last name is spelled "Schilinsky" and Sheri Cofsky's first name is spelled "Cheri."

plate on his Mountaineer with a California plate.  (Tr. 1/23/01 at 16-18, 36)  Date and

Barrett returned to the Cofskys' ranch around 7:00 a.m. (Tr. 1/23/01 at 18-23)  At around

10:00 or 11:00 a.m., Date, Manning and Barrett returned to Wal-Mart to retrieve the tools.

(Tr. 1/23/01 at 22)  Date testified that they split up at Wal-Mart and that Manning purchased

ammunition.  (Tr. 1/23/01 at 23, 35)  Date testified that he did not retrieve the previously

abandoned tools.  (Tr. 1/23/01 at 23)  Date testified that they proceeded to Auto Zone and

purchased bolt cutters needed to make a fence and to "wire all the rebar" for the Cofskys'

pool that was being installed.  (Tr. 1/23/01 at 24-25, 35)  Thereafter, they returned to the

Cofskys' residence.  (*Id.* at 23-25)

Date testified that he subsequently realized he was not going to get paid for his work,

so he stole two revolvers from the Cofsky residence and hid them in the van.  (Tr. 1/23/01 at

10, 19-21, 26-28)  Date acknowledged his post-arrest statement to police that he had helped

remove the van's rear seat but explained that he and Manning needed space to pick up

construction materials.  (Tr. 1/23/01 at 25-28)  He also explained that he was in the area of

the courthouse on June 12, 2000 because he and Manning were on their way to a nearby

elementary school to steal bicycles to "fence."  (*Id.* at 11, 27-28, 30-32)  He also testified

that the bolt cutters would be used to steal the bikes.  (*Id.*)

On January 26, 2001, a jury found Petitioner guilty of conspiracy to commit first

degree murder (Count 1) and conspiracy to commit first degree escape (Count 2).

(Respondents' Exh. LL)  On February 16, 2001, the trial court sentenced Petitioner on

Count 1, conspiracy to commit first degree murder, to life imprisonment without possibility

of release until having served 25 calendar years plus an additional two years for commission

of the offense while on release from another felony charge.  (Respondents' Exh. D)  The

court imposed a 3-year term of imprisonment on Count 2, conspiracy to commit escape.  (Id.

at 18)

**B.  Direct Appeal**

On March 1, 2001, Petitioner filed a timely appeal raising the following claims:

A.  The trial court erred as a matter of law and abused its discretion

by refusing to grant [Petitioner's] Rule 20 motion.

> 1. The State did not present sufficient evidence to convict [Petitioner] - or anyone else - of conspiracy to commit first-degree murder.

> 2.  The State did not present sufficient evidence to convict [Petitioner] of participation in any escape plot.

B.  The trial court erred and violated [Petitioner's] rights under the Fifth Sixth and Fourteenth Amendments . . . . by allowing Daniel England to repeat what conspirator Dennis Schilinski told him.

C.  The trial court erred and violated [Petitioner's] due process rights under the Sixth, Eighth and Fourteenth Amendments by not recusing itself *sua sponte*.

> 1.  The court erred and injected itself into the case when it knew but refused to tell counsel why a large number of law enforcement personnel was present before a four-day recess.

> 2.  The court erred by not recusing itself when it appeared that the judge was a *de facto* witness.

D.  The trial court knowingly erred as a matter of law when it refused to give a proper jury instruction on a single conspiracy to commit multiple events and when it imposed two sentences for one conspiracy that included both counts.

E.  The trial court erred as a matter of law and violated [Petitioner's] Constitutional rights by forcing the defense to use its limited peremptory challenges to strike a juror who should have been excused for cause.

F.  The lack of a contemporaneous record, a sentencing transcript, deprived [Petitioner] of his Due Process Rights and his constitutional right to appeal from the enhanced, aggravated sentences imposed.

(docket # 1-3 at 1-5)

On October 29, 2002, the Arizona Court of Appeals affirmed Petitioner's conviction and sentence for conspiracy to commit first-degree murder and vacated his conviction and sentence for conspiracy to commit escape.  (docket # 1-2 at 1-21)  The appellate court found that the indictment was multiplicatus because it charged a single conspiracy in two counts, in violation of Arizona Revised Statute § 13–1003(C).[7]  (*Id.* at 17–18)   The court vacated

---

[7]  A.R.S. § 13–1003(C) (2001), states: "A person who conspires to commit a number of offenses is guilty of only one conspiracy if the multiple offenses are the object of the same agreement or relationship and the degree of the conspiracy shall be determined by the most

Petitioner's conviction and sentence for conspiracy to commit escape because the trial court had not given a jury instruction that would have allowed the jury to decide whether the evidence demonstrated one conspiracy with multiple offenses or two separate conspiracies. (docket # 1-2 at 17)  The appellate court found that there was only one conspiracy and "that the most serious offense conspired to was first-degree murder."  (*Id*. at 16-17)   In vacating Petitioner's conviction and sentence for conspiracy to commit escape, the less serious of the two convictions, the appellate court noted that "[t]his action eliminates any prejudice that the defendant may have . . . suffered by being convicted more than once for a single conspiracy." (*Id*. at 17-18)  To determine the propriety of the two years added to Petitioner's sentence of life imprisonment, the appellate court remanded the case for a jury determination of whether Petitioner committed the offense while on felony release.  (docket # 1-2 at 20-21)  On remand, the trial court granted the State's motion to withdraw the allegation that Petitioner committed the offense while on felony release.  (Respondents' Exh. F at 23-25)

On January 3, 2003, Petitioner filed a petition for review in the Arizona Supreme Court.  (docket # 1-4 at 28-40)  On June 30, 2003, the Arizona Supreme Court denied review without comment.  (docket # 1-2 at 22)

### C. Post-Conviction Proceedings

On July 21, 2003, Petitioner filed a notice of post-conviction relief. (Respondents' Exh. G)  The court appointed counsel and, in the subsequently filed petition for post-conviction relief, Petitioner raised the following claims:

> 1.  There is insufficient evidence of Petitioner's intent to conspire to commit first degree murder.  (docket # 1-5 at 11)
>
> a. Petitioner's conviction violates *Evanchyk v. State*, 47 P.3d 1114 (Ariz. 2002) because there is "no proof" that "Petitioner intended to kill nor that he ever entered into an agreement with a co-conspirator to commit the crime of murder."  (docket # 1-5 at 13, 14)
>
> 2.  "In the alternative, Petitioner is entitled to relief under Rule 32.1(a)

serious offense conspired to."

1   where he was deprived of his Sixth Amendment right to the effective
    assistance of counsel on his appeal by failure to cite *Evanchyk*."
2   (docket # 1-5 at 15)

3       On May 6, 2005, the trial court denied Petitioner's petition for post-conviction

4   relief, finding that Petitioner "failed to present any claim raising a material issue of fact or

5   law which would entitle him to relief under Rule 32," and that Petitioner had "presented no

6   colorable claim for relief justifying the setting of an evidentiary hearing." (docket # 1-2 at

7   25)

8       On May 23, 2005, Petitioner filed a motion for rehearing, arguing that the State and

9   the trial court had "miss[ed] the point of the Petition completely," because "[t]here was no

10  proof of any intent (conditional or otherwise) by Petitioner to conspire to commit murder."

11  (docket # 1-5 at 18-19)  Petitioner also re-urged his claim of ineffective assistance of

12  appellate counsel, arguing that "appellate counsel made the wrong argument" by arguing

13  only "that conditional intent was not sufficient," rather than asserting that "there was no

14  proof at all of Petitioner's intent [to conspire to commit first degree murder], conditional or

15  otherwise."  (docket # 1-5 at 18-20)  On June 17, 2005, the trial court denied Petitioner's

16  motion for rehearing on the grounds that the Arizona Court of Appeals had "addressed and

17  decided against" Petitioner his claim "that there was insufficient evidence of his intent to

18  conspire to commit murder."  (docket # 1-2 at 26)

19      On July 14, 2005, Petitioner filed a petition for review from the trial court's denial

20  of post-conviction relief in the Arizona Court of Appeals.  (docket # 1-5 at 22-46)  Petitioner

21  presented the following claims: (1) there was insufficient evidence of Petitioner's intent to

22  conspire to commit first-degree murder; and (2) petitioner was denied effective assistance of

23  counsel because appellate counsel failed to cite *Evanchyk*.  (*Id*. at 35, 41)  The appellate

24  court summarily denied review on July 10, 2006.  (docket # 1-2 at 28)  Petitioner sought

25  review in the Arizona Supreme Court which was denied on December 12, 2006.  (docket #

26  1-5 at 47-69; docket 1-2 at 29)

27

28

**D.  Federal Petition for Writ of Habeas Corpus**

Thereafter, Petitioner timely[8] filed the instant Petition for Writ of Habeas Corpus raising the following five claims:

> 1.  Petitioner's Fourteenth Amendment right to due process was violated because there was insufficient evidence to support his conviction for conspiracy to commit first degree murder;
>
> 2.  Petitioner's Fifth, Sixth, and Fourteenth Amendment rights to a fair trial and due process were violated because a jury instruction lowered the State's burden of proof;
>
> 3.  Petitioner's Sixth Amendment right to effective assistance of appellate counsel was violated because appellate counsel did not cite *Evanchyk v. State*, 47 P.3d 1114 (Ariz. 2002) in support of Petitioner's claim that insufficient evidence supported his conviction for conspiracy to commit first degree murder;
>
> 4.  Petitioner's Sixth and Fourteenth Amendment right to confront witnesses was violated by the admission of an out-of-court statement by an alleged co-conspirator; and
>
> 5.  Petitioner's Fourteenth Amendment right to due process was violated by the trial judge's failure to recuse himself.

(docket # 1)

In Petitioner's Supporting Memorandum,[9] Petitioner also asserts that the trial court improperly gave a jury instruction based on a *Pinkerton* theory of liability which is not recognized in Arizona.  (docket # 1-2 at 15, 20) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).  In his Reply, Petitioner expands his *Pinkerton* claim and argues that the "flawed jury instruction diluted the State's burden of proof, because it did not require the jury to find beyond a reasonable doubt that Petitioner possessed the requisite intent to commit murder."  (docket # 14 at 11)  Because Petitioner's challenge to the *Pinkerton* jury instruction was not articulated in his Petition, was only alluded to in his Supporting Memorandum in relation to other substantive claims, and was not more fully developed until his Reply, the Court gave parties the opportunity to address this claim in supplemental

---

[8]  Respondents concede that the Petition is timely under the ADEPA.  (docket # 10 at 10-12)

[9]  Petitioner's supporting memorandum is buried amongst the exhibits attached to his Petition (docket # 1-2 at 30-70)

1    briefing which both parties submitted.  (dockets # 18 - 20)   Consistent with the parties'

2    supplemental briefing, the Court refers to Petitioner's challenge to the *Pinkerton* jury

3    instruction as Ground VI.

4            Respondents assert that Grounds 2, 5 and 6 are procedurally defaulted and barred

5    from federal review.  (dockets # 10, # 19)  Petitioner disputes these assertions.  (dockets

6    # 14, # 20)  The Court will discuss the law regarding exhaustion, procedural bar, and the

7    standard of review and will then apply that law to Petitioner's claims.

8    **II. Exhaustion and Procedural Bar**

9            A federal court may not grant a petition for writ of habeas corpus unless the

10   petitioner has exhausted the state remedies available to him.  28 U.S.C. § 2254(b).  When

11   seeking habeas relief, petitioner bears the burden of showing that he has properly exhausted

12   each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981) (*per curiam*). The

13   exhaustion inquiry focuses on the availability of state remedies at the time the petition for

14   writ of habeas corpus is filed in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

15   The prisoner "shall not be deemed to have exhausted . . . if he has the right under the law of

16   the State to raise, by any available procedure, the question presented."  28 U.S.C. §

17   2254(c).  In other words, proper exhaustion requires the prisoner to "give the state courts

18   one full opportunity to resolve any constitutional issues by invoking one complete round of

19   the State's established appellate review process."  *O'Sullivan*, 526 U.S. 845. "One complete

20   round" includes filing a "petition[] for discretionary review when that review is part of the

21   ordinary appellate review procedure in the State."  *Id.*  State prisoners may skip a

22   procedure occasionally employed by a state's courts to provide relief only if a state law or

23   rule precludes use of the procedure, or the "State has identified the procedure as outside the

24   standard review process and has plainly said that it need not be sought for purposes of

25   exhaustion."  *Id.* at 848, 850.

26           In this case, Respondents argue that because Petitioner, who received a sentence of

27   life imprisonment, did not present several of his federal claims to the Arizona Supreme

28   Court, those claims are unexhausted.  (docket # 10 at 12-13 n. 8)  As discussed below,

- 14 -

1   Petitioner was not required to present his claims to the Arizona Supreme Court to satisfy

2   the exhaustion requirement of § 2254(b).

3       **A. Proper Forum**

4           To exhaust state remedies, a petitioner must afford the state courts the opportunity to

5   rule upon the merits of his federal claims by "fairly presenting" them to the state's

6   "highest" court in a procedurally appropriate manner.  *Castille v. Peoples*, 489 U.S. 346,

7   349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the State

8   with the necessary 'opportunity,' the prisoner must "fairly present" her claim in each

9   appropriate state court . . . thereby alerting the court to the federal nature of the claim.").

10  Contrary to Respondents' assertion, in Arizona, unless a prisoner has been sentenced to

11  death, the "highest court" requirement is satisfied if the petitioner has presented his federal

12  claim to the Arizona Court of Appeals either on direct appeal or in a petition for post-

13  conviction relief.  *Crowell v. Knowles* , 483 F.Supp.2d 925 (D.Ariz. 2007) (discussing

14  *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

15          Relying on *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999) and *Baldwin v. Reese*,

16  541 U.S. 27 (2004), Respondents argue that to properly exhaust federal claims, a Petitioner

17  who received a life sentence is required to present those claims to the Arizona Supreme

18  Court.  (docket # 10 at 12 n. 8)  *Swoopes* does not support this assertion.  Although less

19  than a life sentence had been imposed in *Swoopes*, the Ninth Circuit broadly stated that

20  "Arizona state prisoners need not appeal an Arizona Court of Appeals' denial of post-

21  conviction relief to the Arizona Supreme Court in order to exhaust their state remedies for

22  federal habeas corpus purposes, except in capital cases or cases involving the imposition of

23  a life sentence." 196 F.3d at 1008.  In support of this conclusion, *Swoopes* included undated

24  citations to A.R.S. §§ 120.21(A)(1), 12-120.24, and 13-4031, and citations to

25  Ariz.R.Crim.P. 31, *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), *State v. Sandon*,

26  161 Ariz. 157, 777 P.2d 220 (1989), and *Moreno v. Gonzalez*, 192 Ariz. 131, 962 P.2d 205

27  (1989).  *Swoopes*, 196 F.3d at 1009-10.  As the court noted in *Crowell v. Knowles*, 483

28  F.Supp.2d 925, 930 (D.Ariz. 2007), "none of those authorities — either at the time of

1   *Swoopes* or now — support the proposition that Arizona Supreme Court review remains

2   part of the standard review process necessary for exhaustion in cases carrying *life*

3   *sentences*. *Id*. (emphasis in original).  Rather, to the extent those authorities mentioned life

4   imprisonment, it was in reference to outdated versions of A.R.S. § 12-201.21(A)(1) and 13-

5   4031.  In 1989, years before *Swoopes* was decided, A.R.S. § 12-120.21(A)(1) and § 13-

6   4031 were amended to omit the phrase, "or life imprisonment."  "The effect of this change

7   was to give the Arizona Court of Appeals jurisdiction over criminal convictions carrying

8   life sentences and eliminate the [Arizona] Supreme Court's exclusive and mandatory

9   jurisdiction." *Crowell*, 483 F.Supp.2d at 928.

10       The erroneous statement of the law included in *dictum* in *Swoopes* was repeated in

11   *dictum* in *Castillo v. McFadden*, 399 F.3d 993 (9th Cir. 1994) and several district cases.

12   *See*, *Crowell,* 483 F.Supp.2d at 930 and n. 4 (compiling cases).  These cases, however,

13   "present a tale of zombie precedent.  A rule definitively extinguished by statutory

14   amendment in 1989 continues to prowl, repeatedly re-animated by mistaken citation and

15   dicta." *Id.* at 931.

16       Accordingly, in *Crowell*, the court found that "[s]ince 1989, the Arizona Supreme

17   Court has not had exclusive appellate jurisdiction over cases carrying life sentences, and

18   petitioners who have received a life sentence have not had a right to State Supreme Court

19   review." *Id.*  The court went on to hold that:

20       In sum, the language of *Swoopes* on life sentences was dictum unnecessary
         for the correct disposition of that case.  The subsequent repetition of that
21       dictum as dictum in other cases does not change its character.  Nor do any of
         the dicta undercut the clarity of the pronouncement by the Arizona Supreme
22       Court, together with the 1989 enactments of the Arizona Legislature, that
         discretionary review in non-capital cases is 'unavailable' for purposes of
23       federal habeas exhaustion.

24   *Id.* at 933.  The *Crowell* court found that petitioner, who had received a life sentence, had

25   exhausted his federal claims by presenting them to the Arizona Court of Appeals.  *Id.*  The

26   court further noted that the *Swoopes* decision supported its conclusion.  *Id.*  The court

27   explained that, "[a]pplying *O'Sullivan*, *Swoopes* held that 'Arizona has declared that its

28   complete round [of appellate review] does not include discretionary review before the

1    Arizona Supreme Court.'" 483 F.Supp.2d at 933 (quoting *Swoopes*, 940 F.3d 1308).  The

2    *Crowell* court concluded that "there is no longer any basis for distinguishing among non-

3    capital sentences under 28 U.S.C. § 2254(c) in light of the 1989 amendments to A.R.S. §

4    12-120.21(A)(1) and 13-4031."  *Crowell*, 483 F.Supp.2d at 933.

5         In accordance with Arizona law and the thorough discussion in *Crowell*, to properly

6    exhaust his federal claims, Petitioner was not required to present his claims to the Arizona

7    Supreme Court.  Rather, the "highest court" requirement is satisfied by fair presentation to

8    the Arizona Court of Appeals.

9         The Supreme Court's decision in *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) does not

10   require a different conclusion.  Respondents argue that pursuant to *Baldwin*, non-capital

11   defendants must exhaust their claims in the Arizona Supreme Court.  Respondents'

12   argument hinges on the following language in *Baldwin*, "[t]o provide the State with the

13   necessary 'opportunity,' [to rule on his claims] the prisoner must 'fairly present' his claim

14   in each appropriate state court (*including a state supreme court with powers of*

15   *discretionary review*), thereby alerting that court to the federal nature of the claim."

16   *Baldwin*, 541 U.S. at 29 (emphasis added) (citations omitted).  Respondents latch onto a

17   single phrase, "including a state supreme court with powers of discretionary review," to

18   support their argument and ignore the basis for this statement.  In *O'Sullivan*, the Supreme

19   Court explained that proper exhaustion requires the prisoner to "give the state courts one

20   full opportunity to resolve any constitutional issues by invoking one complete round of the

21   State's established appellate review process." *O'Sullivan*, 526 U.S. 845. "One complete

22   round" includes filing a "petition[] for discretionary review *when that review is part of the*

23   *ordinary appellate review procedure in the State*." *Id.* (emphasis added).

24        As previously stated, "Arizona has declared that its complete round [of appellate

25   review] does not include discretionary review before the Arizona Supreme Court."

26

27

28

1    *Swoopes*, 940 F.3d 1308.[10]  Thus, contrary to Respondents' assertion, *Baldwin* does not

2    require a non-capital prisoner in Arizona, such as Petitioner, to present his claims to the

3    Arizona Supreme Court.

4          **B.  Fair Presentation**

5          In addition to presenting his claims to the proper court, a state prisoner must fairly

6    present those claims to that court to satisfy the exhaustion requirement.  Fair presentation

7    requires a petitioner to describe both the operative facts and the federal legal theory to the

8    state courts.  *Baldwin*, 541 U.S. at 28.  It is not enough that all of the facts necessary to

9    support the federal claim were before the state court or that a "somewhat similar" state law

10   claim was raised.  *Baldwin*, 541 U.S. at 28 (stating that a reference to ineffective assistance

11   of counsel does not alert the court to federal nature of the claim).  Rather, the habeas

12   petitioner must cite in state court to the specific constitutional guarantee upon which he

13   bases his claim in federal court.  *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001).

14   Similarly, general appeals to broad constitutional principles, such as due process, equal

15   protection, and the right to a fair trial, are insufficient to establish fair presentation of a

16   federal constitutional claim.  *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000),

17   *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*, 223 F.3d

18   982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal to a

19   constitutional guarantee," such as a naked reference to "due process," or to a "constitutional

20   error" or a "fair trial").  Likewise, a mere reference to the "Constitution of the United

21   States" does not preserve a federal claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63

22   (1996).  Even if the basis of a federal claim is "self-evident" or if the claim would be

23   decided "on the same considerations" under state or federal law, the petitioner must make

24   ───────────────

25        [10] In support of their assertion that discretionary review by the Arizona Supreme Court is part
     of the appeals process in Arizona, Respondents cite *State v. Ikirt*, 160 Ariz. 113, 117, 770 P.2d

26   1159, 1163 (1989).  (docket # 10 at 12-13 n. 8)  *Ikirt* was decided before the April 1989
     amendments to A.R.S. § 12-120.21(A)(1) and § 13-4031which omitted the phrase "or life

27   imprisonment" and effectively gave the Arizona Court of Appeals jurisdiction over criminal
     convictions carrying life sentences.

28

1   the federal nature of the claim "explicit either by citing federal law or the decision of the

2   federal courts . . . ." *Lyons*, 232 F.3d at 668.  A state prisoner does not fairly present a

3   claim to the state court if the court must read beyond the pleadings filed in that court to

4   discover the federal claim.  *Baldwin*, 541 U.S. at 27.

5       In sum, "a petitioner fairly and fully presents a claim to the state court for purposes

6   of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum,

7   (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for

8   the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (citations omitted).

9       **C.  Procedural Default**

10      A habeas petitioner's claims may be precluded from federal review in either of two

11  ways.  First, a claim may be procedurally defaulted in federal court if it was actually raised

12  in state court but found by that court to be defaulted on state procedural grounds such as

13  waiver or preclusion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Coleman*, 501

14  U.S. at 729-30.  Thus, a state prisoner may be barred from raising federal claims that he did

15  not preserve in state court by making a contemporaneous objection at trial, on direct appeal,

16  or when seeking post-conviction relief.  *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995)

17  (stating that failure to raise contemporaneous objection to alleged violation of federal rights

18  during state trial constitutes a procedural default of that issue); *Thomas v. Lewis*, 945 F.2d

19  1119, 1121 (9th Cir. 1991) (finding claim procedurally defaulted where the Arizona Court

20  of Appeals held that habeas petitioner had waived claims by failing to raise them on direct

21  appeal or in first petition for post-conviction relief.)  If the state court also addressed the

22  merits of the underlying federal claim, the "alternative" ruling does not vitiate the

23  independent state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989);

24  *Carringer v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (state supreme court found

25  ineffective assistance of counsel claims "barred under state law," but also discussed and

26  rejected the claims on the merits, *en banc* court held that the "on-the-merits" discussion

27  was an "alternative ruling" and the claims were procedurally defaulted and barred from

28

1    federal review).  A higher court's subsequent summary denial of review affirms the lower

2    court's application of a procedural bar.  *Nunnemaker*, 501 U.S. at 803.

3         The second procedural default scenario arises when a state prisoner failed to present

4    his federal claims to the state court, but returning to state court would be "futile" because

5    the state courts' procedural rules, such as waiver or preclusion, would bar consideration of

6    the previously unraised claims.  *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Beaty v.*

7    *Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d

8    1035, 1048-53 (1996); Ariz. R. Crim. P. 32.2(a) & (b); Ariz. R. Crim. P. 32.1(a)(3) (post-

9    conviction review is precluded for claims waived at trial, on appeal, or in any previous

10   collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must

11   be filed within thirty days of trial court's decision).  A state post-conviction action is futile

12   where it is time-barred.  *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410

13   (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for

14   dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under

15   Rule 32.2(a)).  This type of procedural default is known as "technical" exhaustion because

16   although the claim was not actually exhausted in state court, the petitioner no longer has an

17   available state remedy.  *Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted

18   his federal claims in state court meets the technical requirements for exhaustion; there are

19   no remedies any longer 'available' to him.").

20        **D.  Excusing Procedural Default**

21        In either case of procedural default, federal review of the claim is barred absent a

22   showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Cook v.*

23   *Schriro*, 516 F.3d 802, 827-29 (9th Cir. 2008); *Dretke v. Haley*, 541 U.S. 386, 393-94,

24   (2004); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To establish "cause," a petitioner

25   must establish that some objective factor external to the defense impeded his efforts to

26   comply with the state's procedural rules.  *Id*.  The following objective factors may

27   constitute cause: (1) interference by state officials, (2) a showing that the factual or legal

28   basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance

of counsel.  *Id.*  Ordinarily, the ineffective assistance of counsel in collateral proceedings does not constitute cause because "the right to counsel does not extend to state collateral proceedings or federal habeas proceedings." *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996).

Prejudice is actual harm resulting from the constitutional violation or error.  *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  To establish prejudice, a habeas petitioner bears the burden of demonstrating that the alleged constitutional violation "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension."  *United States v. Frady*, 456 U.S. 152, 170 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1996).  Where petitioner fails to establish cause, the court need not reach the prejudice prong.

A federal court may also review the merits of a procedurally defaulted claim if petitioner demonstrates that failure to consider the merits of his claim will result in a "fundamental miscarriage of justice."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A "fundamental miscarriage of justice" occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent.  *Id.*  To satisfy the "fundamental miscarriage of justice" standard, petitioner must establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence.  *Schlup*, 513 U.S. at 327; 28 U.S.C. § 2254(c)(2)(B).  Even if petitioner asserts a claim of actual innocence to excuse his procedural default, federal habeas relief may not be granted absent a finding of an independent constitutional violation occurring in the state criminal proceedings.  *Dretke*, 541 U.S. at 393-94.

**III.  Standard of Review**

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

1
2
3
4

Under the AEDPA, a state prisoner "whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price v. Vincent*, 538 U.S. 634, 638 (2003). Thus, a state prisoner is not entitled to relief unless he demonstrates that the state court's adjudication of his claim -

5
6

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8
9
10

28 U.S.C. § 2254(d); *see also Carey v. Musladin*, 549 U.S. 70 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006).

11
12
13
14
15
16
17
18
19
20
21
22
23

Petitioner bears the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application, of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts must look exclusively to the holdings of the Supreme Court which existed at the time of the state court's decision. *Mitchell v. Esparza*, 540 U.S. 12, 15-15 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). Accordingly, the Ninth Circuit has acknowledged that it cannot reverse a state court decision merely because it conflicts with Ninth Circuit precedent on a federal constitutional issue. *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). However, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

24
25
26
27
28

Even if the state court neither explained its ruling nor cites United States Supreme Court authority, the reviewing federal court must nevertheless examine Supreme Court precedent to determine whether the state court reasonably applied federal law. *Early v. Packer*, 537 U.S. 3, 8 (2003). The United States Supreme Court has expressly held that citation to federal law is not required and that compliance with the habeas statute "does not

1    even require awareness of our cases, so long as neither the reasoning nor the result of the
2    state-court decision contradicts them." *Id.*

3        Section 2254(d)(1) consists of two alternative tests, "contrary to," or "unreasonable
4    application of" test.  *See Cordova v. Baca*, 346 F.3d 924, 929 (9th Cir. 2003).  Under the
5    "contrary to" test, the state court's decision is "contrary to" federal law if it applies a rule of
6    law "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts
7    a set of facts that are materially indistinguishable from a decision of [the Supreme Court]
8    and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*
9    *Esparza*, 540 U.S 12, 14 (2003)(citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411
10   (2000); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

11       Under the "unreasonable application of" test, a state court decision involves an
12   "unreasonable application of" federal law if the court identifies the correct legal rule, but
13   unreasonably applies the rule to the facts of a particular case.  *Williams*, 529 U.S. at 405;
14   *Brown v. Payton*, 544 U.S. 133, 141 (2005).   An incorrect application of federal law does
15   not satisfy this standard.  *Yarborough v. Alvarado*, 541 U.S. 652, 665-66 (2004) (stating
16   that "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively
17   unreasonable.")  "It is not enough that a federal habeas court, in its independent review of
18   the legal question," is left with the "firm conviction" that the state court ruling was
19   "erroneous." *Id.*; *Andrade*, 538 U.S. at 75.  Rather, the petitioner must establish that the
20   state court decision is "objectively unreasonable."  *Middleton v. McNeil*, 541 U.S. 433
21   (2004); *Andrade*, 538 U.S. at 76.

22        Under § 2254(d)(2), a habeas petitioner may also be entitled to relief if the state
23   court's adjudication of his claim "resulted in a decision that was based on an unreasonable
24   determination of the facts in light of the evidence presented at the State court proceeding."
25   28 U.S.C. § 2254(d)(2).   The question under § 2254(d)(2) is whether the reviewing court
26   "could reasonably conclude that the finding is supported by the record." *Lambert v.*
27   *Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).  *See also, Taylor v. Maddox*, 366 F.3d 992, 999
28   (9th Cir. 2004) (stating that a federal court may not second-guess a state court's fact-finding

1    process unless, after review of the state-court record, it determines that the state court was

2    not merely wrong, but actually unreasonable.")   Section (d)(2) "applies most readily to

3    situations where petitioner challenges that state court's findings based entirely on the state

4    record.  Such a challenge may be based on the claim that the finding is unsupported by

5    sufficient evidence, . . . that the process employed by the state court is defective, . . . or that

6    no finding was made by the state court at all." *Taylor*, 366 F.3d at 999 (citations omitted).

7    When reviewing the record under § 2254(d)(2), the federal court "must be particularly

8    deferential to [its] state court colleagues . . . [M]ere doubt as to the adequacy of the state

9    court's findings of fact is insufficient; 'we must be satisfied that any appellate court to

10   whom the defect [in the state court's fact-finding] is pointed out would be unreasonable in

11   holding that the state court's fact-finding process was adequate.'" *Lambert*, 393 F.3d at 972

12   (quoting *Taylor*, 366 F.3d at 1000).

13          If petitioner does not challenge the state court's factual findings, or if the federal

14   court has determined that the state's determination of the facts was reasonable, the state

15   court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A presumption of

16   correctness applies to factual determinations, as well as credibility determinations, made by

17   either the state trial or appellate court. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.

18   2001) (citing *Sumner v.  Mata*, 449 U.S. 539, 546-47 (1981)).  A habeas petitioner carries

19   the burden of rebutting the presumption of correctness by clear and convincing evidence.

20   28 U.S.C. § 2254(e)(1); *Bragg*, 242 F.3d at 1087.  Additionally, the habeas court is bound

21   by the state court's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th

22   Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

23          In deciding whether a state court's decision is contrary to, or an unreasonable

24   application of, clearly established federal law, or involves an unreasonable determination of

25   the facts, a federal court looks to the decision of the highest state court to address the merits

26   of petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n. 7

27   (9th Cir. 2000).  Where the state courts supply no reasoned decision on some or all of a

28   petitioner's claims, the federal court independently reviews the record to determine whether

the state court clearly erred in its application of Supreme Court law. *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir. 2003). Contrary to Petitioner's assertion, (*see* docket # 14 at 8), "[f]ederal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Delgado v. Lewis,* 223 F.3d 976, 981 (9th Cir. 2000). In other words, although the federal court independently reviews the record, it still defers to the state court's ultimate conclusion.

Where a state court decision is deemed to be "contrary to" or an "unreasonable application of" clearly established federal law, or based on an unreasonable determination of the facts, the reviewing court must next determine whether it resulted in constitutional error. *Benn v. Lambert,* 283 F.3d 1040, 1052 n. 6 (9th Cir. 2002). Habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993). In § 2254 proceedings, the federal court must assess the prejudicial impact of a constitutional error in a state-court criminal proceeding under *Brecht's* more forgiving "substantial and injurious effect" standard, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California,* 386 U.S. 18, 24 (1967); *Fry v. Pliler,* ___ U.S.___, 127 S.Ct. 2321, 2328 (2007). The *Brecht* harmless error analysis also applies to habeas review of a sentencing error. The test is whether such error had a "substantial and injurious effect" on the sentence. *Calderon v. Coleman,* 525 U.S. 141, 145-57 (1998) (holding that for habeas relief to be granted based on constitutional error in capital penalty phase, error must have had substantial and injurious effect on the jury's verdict in the penalty phase.); *Hernandez v. LaMarque,* 2006 WL 2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if the evidence of three of petitioner's prior convictions was insufficient, petitioner was not prejudiced by the court's consideration of those convictions because the trial court found four other prior convictions which would have supported

1  petitioner's sentence.)  The Court will review Petitioner's claims that are properly before it

2  under the applicable standard of review.

3  **IV. Analysis of Petitioner's Claims**

4      Petitioner presents six grounds for relief.  (dockets # 1, # 1-2 at 30-70, # 14, # 20)

5  Below, the Court will determine whether Petitioner has satisfied the exhaustion

6  requirement and will consider the merits of Petitioner's claims that are properly before the

7  Court.

8      **A.  Ground One - Sufficiency of the Evidence**

9      In Ground One, Petitioner alleges that his conviction for conspiracy to commit first

10  degree murder violates the Fourteenth Amendment and *Jackson v. Virginia*, 443 U.S. 307

11  (1979) because there was insufficient evidence to establish beyond a reasonable doubt that

12  he intended to commit first-degree murder.  (docket # 1 at 6; docket 1-2 at 45)  In a lengthy,

13  rambling narrative, Petitioner argues that there was no proof of his agreement to commit

14  first degree murder and that "proof that [Petitioner] had no more than the requisite intent to

15  aide, promote, or commit the underlying felony is insufficient to convict of conspiracy to

16  commit first-degree murder."  (docket # 1-2 at 46)  He argues that the evidence

17  demonstrated there was never an agreement between any conspirator to commit the offense

18  of murder and, therefore, the State failed to prove the "statutory requirements" beyond a

19  reasonable doubt and his conviction for conspiracy to commit first degree murder violates

20  the Fourteenth Amendment.[11]  (docket # 1-2 at 45-48)

21      Respondents concede that Petitioner properly exhausted his claim that the State

22  presented insufficient evidence to find him guilty of conspiracy to commit first degree

23  murder.  (docket # 10 at 20)

24  _____

25    [11] Petitioner also argues that he was "convicted of . . . conspiracy to commit murder because
of the jury instruction explaining that a conspirator is liable for all criminal acts committed by

26  a co-conspirator during and in furtherance of the conspiracy."  (docket # 1-2 at 46) (citing Tr.
1/24/01 at 18)  This statement refers to the jury instruction based on *Pinkerton v. United States,*

27  328 U.S. 640 (1946).  Petitioner's challenge to the *Pinkerton* jury instruction is a separate claim

28  that will be considered in Petitioner's sixth ground for relief.

### 1. Relevant Background

During trial, Petitioner moved for a directed verdict under Ariz.R.Crim.P. 20 on the charge of conspiracy to commit first-degree murder.  He argued that there was no proof offered that there was a conspiracy to kill anyone.  (Respondents' Exh. AA at 408)  The trial court denied the Rule 20 motion concluding that "if there is a conspiracy that if certain circumstances occur, then a person will be murdered, . . . that is a conspiracy to commit first degree murder. "  (Respondents' Exh. AA at 421-22)  The court further stated that, "[a]s far as the evidence to support any one person's involvement in this case, there has been a lot of evidence cross-referencing these four defendants with each other and with Mr. Schilinsky and with Mr. Goldberg . . . [T]here is the least amount of evidence against Sheri Cofsky, and there is a higher level of evidence against Mr. Cofsky . . . ."  (Respondents' Exh. AA at 422) "[T]he evidence is sufficient to establish" conspiracy to commit first degree murder or conspiracy to commit escape "as to all four of the defendants." (Respondents' Exh. AA at 423)

On direct appeal, Petitioner argued that the trial court erred by denying his Rule 20 motion because "[t]he only evidence . . . of a murder conspiracy was that any killing was contingent on whether other events intervened," and thus the evidence failed to show specific intent to kill and premeditation required for a conviction of conspiracy to commit first-degree murder.  (docket # 1-3 at 28-29)  Petitioner argued that the State "presented no evidence of an agreement involving" Petitioner.  (Respondents' Exh. AA at 408)  The Arizona Court of Appeals rejected Petitioner's claims.  (docket # 1-2 at 1-21)  The court noted that Petitioner argued that, "at most, the evidence showed that he and the other conspirators had a conditional intent to kill the guard, if it became necessary, [and] that this is not the kind of *specific intent* needed for a conviction of conspiracy to commit murder." (docket # 1-2 at 11-12) (emphasis in original).  The Arizona Court of Appeals also noted that Petitioner asserted that the State failed to present evidence of premeditation to commit first-degree murder.   The appellate court denied Petitioner's claims relying on *United States v. Holloway*, 526 U.S. 1 (1999), where the Supreme Court found that conditional

- 27 -

1   intent satisfied the intent requirement in the federal car jacking statute.  (docket # 1-2 at 11)

2   The Court of Appeals specifically relied on the Supreme Court's statement in *Holloway*

3   that "a defendant may not negate a proscribed intent by requiring the victim to comply with

4   a condition the defendant has no right to impose; an intent to kill, in the alternative, is

5   nevertheless, an intent to kill."  (docket # 1-2 at 12) (citations omitted)   The appellate court

6   concluded that the evidence at trial was sufficient to support Petitioner's conviction for

7   conspiracy to commit first-degree murder.  And that the evidence was sufficient to show

8   both intent – that Petitioner intended to kill a guard – and premeditation – that Petitioner

9   entered into an agreement with at least one other person to kill a guard – because "the

10   conspirators intended to kill a deputy, if the deputy lawfully resisted their unlawful attempt

11   to break Goldberg out of jail."  (docket # 1-2 at 12)

12        On post-conviction review, Petitioner again challenged the sufficiency of the

13   evidence to support his conviction for conspiracy to commit first-degree murder.  (docket #

14   1-5 at 11-16)  Petitioner argued that the Arizona Supreme Court's decision in *Evancyk v.*

15   *Stewart*, 202 Ariz. 476, 47 P.3d 1114 (Ariz. 2002), issued while Petitioner's case was

16   pending on direct appeal, invalidated his conviction for conspiracy to commit first-degree

17   murder.  (docket # 1-5 at 13)  Petitioner specifically argued that, under *Evanchyk*,

18   conspiracy to commit first-degree murder is a specific intent crime and that "in order to

19   convict, the State must prove as an element of the offense that the defendant intended to kill

20   and entered into an agreement with a co-conspirator to commit the crime of murder."

21   (docket # 1-5 at 13)  Petitioner argued that the facts found by the appellate court did not

22   prove that he was involved in any plan or that he had the intent to kill anyone.  (*Id*. at 15)

23   The trial court rejected Petitioner's claims.  (docket # 1-2 at 23-25)

24        On May 24, 2005, Petitioner filed a motion for rehearing, arguing that the trial court

25   misunderstood his argument in his petition for post-conviction relief.  (docket # 1-5 at 17-

26   21)  Petitioner conceded that "it is sufficient in a conspiracy case to prove conditional

27   intent," but argued that his "Rule 20 motion should have been granted" because "the State

28   has failed to demonstrate the requisite intent necessary to convict [Petitioner] of conspiracy

1   to commit murder."  (docket # 1-5 at 18-19)   Citing *Evanchyk*, Petitioner argued that

2   "Arizona conspiracy law now requires proof of a defendant's intent to participate in the

3   particular crime charged, not just a generic intent to participate in the overall conspiracy."

4   (docket # 1-5 at 19)   Petitioner argued that his Rule 20 motion should have been granted

5   because the State failed to present "proof of any intent (conditional or otherwise) by

6   Petitioner to conspire to commit murder."  (*Id.*)

7          On June 17, 2005, the trial court denied Petitioner's motion for rehearing explaining

8   that:

9          In reviewing [Petitioner's] Petition, the Court notes now as it did
       before entering its ruling that the first paragraph of the Petition asserts that
10     [Petitioner] is entitled to post-conviction relief because of a significant change
       in the law.  Because the Court had already ruled on that specific issue when
11     raised under Rule 32 by a co-Defendant in this case, the Court's Order denying
       post-conviction relief focused on that issue.
12
              The Court realizes upon reading the Motion for Rehearing and re-reading
13     the original Petition that [Petitioner] is also making a slightly different and
       more factually-related argument, that there was insufficient evidence of his
14     intent to conspire to commit murder.  The Court feels that this issue was
       addressed and decided against [Petitioner] by the Court of Appeals on direct
15     appeal.  The Court of Appeals issued its decision on October 29, 2002, and
       presumably was aware at that time of the *Evanchyk* decision which had been
16     decided by the Arizona Supreme Court on May 24, 2002.  Cases in Arizona
       repudiating the *Pinkerton* doctrine of liability for crimes committed by a
17     coconspirator were decided many years ago and [Petitioner's] guilt in this
       case was not based upon the *Pinkerton* doctrine anyway.
18
19   (docket # 1-2 at 26-27)   Petitioner sought review in the Arizona Court of Appeals and

20   Arizona Supreme Court which both summarily denied relief.  (docket # 1-5 at 22-46, 47-60;

     docket # 1-2 at 28-29)
21
22          **2. Merits Review of Ground One**

23          **a. The *Evanchyk* Decision**

24          In Ground One, Petitioner claims that there is insufficient evidence to support his

25   conviction for conspiracy to commit first-degree murder because there was no proof of his

26   agreement to commit first degree murder and that "proof that [Petitioner] had no more than

27   the requisite intent to aide, promote, or commit the underlying felony is insufficient to

     convict of conspiracy to commit first-degree murder."  (docket # 1-2 at 46) Petitioner
28

argues that the Arizona Court of Appeals' decision that sufficient evidence supported his conviction "is contrary to federal law" because, by failing to apply rule announced by the Arizona Supreme Court in *Evanchyk*, the court required "no evidence at all of Petitioner agreeing to any murder." (docket # 1-2 at 46-47) He argues that the evidence demonstrated there was never an agreement between any conspirator to commit the offense of murder and, therefore, the State failed to prove the "statutory requirements" beyond a reasonable doubt and his conviction for conspiracy to commit first degree murder violates the Fourteenth Amendment. (docket # 1-2 at 45-48)

In support of Ground One, Petitioner asserts that the Arizona Supreme Court's decision in *Evanchyk v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (2002), decided while Petitioner's direct appeal was pending, constitutes a significant change in the law pertaining to conspiracy to commit first-degree murder which would probably have changed the outcome of his case. (docket # 1-2 at 48) In *Evanchyk*, the State charged petitioner with first-degree murder, first-degree burglary, and conspiracy to commit first-degree murder. *Evanchyk v. Stewart*, 340 F.3d 933, 936 (9th Cir. 2003). The trial court gave the following instruction regarding the elements of conspiracy to commit first-degree murder:

> The crime of conspiracy to commit first degree murder requires proof of the following things:
>
> 1. That the defendant agreed with one or more persons that one of them or another person would engage in certain conduct; and
>
> 2. That the defendant intended to promote or assist the commission of such conduct; and
>
> 3. That the intended conduct would constitute a crime [whether known or unknown by defendant to be a crime].

340 F.3d at 936 (modification in original). The jury instructions in *Evanchyk* defined the crime of first-degree murder as either of the following alternatives:

> (1) when 'defendant intended or knew that he would cause the death of another . . . with pre-meditation" or (2) when someone 'commits or attempts to commit burglary and in the course of, and in furtherance of such offense, or imediate (sic) flight from such offense, such person, or other person, causes the death of any person. This type of murder requires no mental state other than that which required for (sic) the commission of the offense of burglary.

1    *Evanchyk*, 340 F.3d at 936-37.   The jury instructions "explicitly reiterated that a conviction

2    for first-degree murder could be based on a felony murder theory that did not require the

3    jury to find an intent to kill, only an intent to commit burglary." 340 F.3d at 937.  The jury

4    found Evanchyk not guilty of first-degree burglary and first-degree murder, but guilty of

5    second degree murder and conspiracy to commit first-degree murder.  340 F.3d at 937.

6    After being denied relief in state court, *Evanchyk* filed a federal petition for writ of habeas

7    corpus.  340 F.3d at 938.  Because Arizona law was not clear on whether conspiracy to

8    commit first-degree murder could be based on the felony-murder type of first-degree

9    murder, the district court certified to the Arizona Supreme Court the following questions:

10      Whether, in Arizona, conspiracy to commit first degree murder may be based
         on felony murder?

11      Or in other words,

12      Under Arizona law, if the intended criminal conduct of an alleged conspiracy

13      is first degree murder, must an alleged conspirator have possessed an intent
         to kill or is it sufficient for the conspirator merely to have had the requisite

14      intent for the underlying felony?

15    *Evanchyk v. Stewart*, 340 F.3d 933, 938 (9th Cir. 2003).

16      The Arizona Supreme Court answered the certified questions as follows:

17      1.  Under Arizona law, a defendant may not be convicted of conspiracy
         to commit first-degree murder when that conviction is based only on the

18      commission of felony murder.

19      2.  Under Arizona law, a defendant can be convicted of conspiracy to commit
         first-degree murder if the state proves the defendant possessed an intent to

20      kill or to promote or aid in killing and made an agreement to kill.  The state
         need not prove the completed offense nor, for that matter, any other offense.

21
     3.  Under Arizona law, a defendant may not be convicted of conspiracy to

22      commit first-degree murder if he had merely the requisite intent to commit
         the underlying felony.

23
   *Evanchyk*, 340 F.3d at 938 (citing *Evanchyk v. Stewart*, 47 P.3d 1114, 1119 (Ariz. 2002)

24    (*Evanchyk III*)).

25
     The Arizona Supreme Court further explained that:

26

27
     because conspiracy to commit first-degree murder cannot be proved without

28      establishing that the defendant premeditated by forming an intent to promote

1    or aid in killing and making an agreement to kill, proof that the defendant had
     no more than the requisite intent to aid, promote, or commit the underlying
2    felony is insufficient to convict of conspiracy to commit first-degree murder.

3    *Evanchyk*, 340 F.3d at 938 (quoting *Evanchyk* III, 47 P.3d at 1119).

4           The Arizona Supreme Court held that because "conspiracy to commit first-degree

5    murder is a specific intent crime ... the state must prove as elements that the defendant

6    intended to kill and entered into an agreement with a coconspirator to commit the crime of

7    murder." *Evanchyk III*, 47 P.3d at 1118-19.  After the Arizona Supreme Court answered the

8    certified questions, the federal district court granted the writ of habeas corpus and the Ninth

9    Circuit affirmed in *Evanchyk v. Stewart*, 340 F.3d 933 (9th Cir.2003).  The Ninth Circuit

10   held that the jury instructions on conspiracy to commit first-degree murder violated due

11   process because the instructions omitted the element of intent to kill. *Id.* at 939-40.  The

12   court noted that "[n]owhere does the instruction say that intent to kill or premeditation is

13   required.  Rather, it refers to the conspired crime as 'conduct' which constitutes 'first-

14   degree murder.'" 340 F.3d at 939.  The court explained that, "[b]y defining 'first-degree

15   murder' as either premeditated murder or felony murder, and then, in the separate

16   conspiracy instruction, defining 'conspiracy to commit first-degree murder' in generic

17   terms as a conspiracy to engage in 'conduct' which constitutes 'first-degree murder,' the

18   instructions could cause a jury to rely upon felony murder as the predicate offense for the

19   conspiracy conviction."  340 F.3d at 939.

20          Petitioner correctly asserts that *Evanchyk* announced a new rule of law to the extent

21   that for the first time the Arizona Supreme Court held that a conviction for conspiracy to

22   commit first-degree murder cannot be based on a theory of felony murder. *Evanchyk III*,

23   202 Ariz. at 480-81, 47 P.3d at 1118-19.  However, contrary to Petitioner's assertion,

24   *Evanchyk*'s holding does not apply in this case because the State did not assert a theory of

25   felony murder, the jury was not instructed under a theory of felony murder, and, thus,

26   Petitioner was not convicted under a felony-murder theory.   Unlike the jury instructions in

27   *Evanchyk*, in this case, the court specifically instructed the jury on "First Degree Murder"

28   under a theory of premeditation.  (Respondents' Exh. Q at 127)  The court defined "First

1    Degree Murder" as premeditated murder.  (Respondents' Exh. Q at 127)  In a separate

2    conspiracy instruction, the court defined "Conspiracy to Commit First Degree murder" as

3    an agreement to engage in "conduct" which constitutes "First Degree Murder" with

4    "intent" to promote or aid the crime of "First Degree Murder."  (Respondents' Exh. Q at

5    123, 127)   Unlike *Evanchyk v. Stewart*, 340 F.3d 933-940 (9th Cir. 2003), the jury

6    instruction on conspiracy to commit first-degree murder in this case included the element of

7    intent to kill.

8         Moreover, the *Evanchyk* court's statement, conspiring to commit first-degree murder

9    is a specific intent crime, was not new law.  Rather, at the time of Petitioner's trial

10   (December 2000 - January 2001), first-degree murder under A.R.S. § 13–1105 was

11   considered a "specific intent" crime, requiring the specific intent to kill another person. *See*

12   *State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher*, 176 Ariz. 69,

13   79, 859 P.2d 179, 189 (1993); *see generally* A.R.S. § 13-1105.  The trial court in this case

14   instructed the jury that first-degree murder required that one act intentionally or knowingly

15   and with premeditation.  (Respondents' Exh. Q at 127)  *Evanchyk* did not require a

16   different jury instruction.

17        Additionally, contrary to Petitioner's assertion, in finding that sufficient evidence

18   supported Petitioner's conviction for conspiracy to commit first-degree murder, the Arizona

19   Court of Appeals relied on a theory of premeditated murder, not felony-murder as

20   Petitioner suggests.  (docket # 1-2 at 46)  The appellate court identified the elements of

21   "first-degree premeditated murder;" (1) a person causes the death of another; (2) with

22   premeditation; (3) by conduct that such person intends or knows will cause death.  (docket

23   # 1-2 at 11)   The Court of Appeals then applied the facts to those elements and concluded

24   that "a defendant who enters [into an agreement to cause the death of another person with

25   premeditation by conduct that such person intends or knows will cause the death]

26   premeditates a killing, even though a conviction for conspiracy does not require an actual

27   murder occur."  (docket # 1-2 at 11)   Applying the law of conspiracy to commit

28   premeditated first-degree murder, the Court of Appeals properly concluded that, "evidence

1  that the conspirators intended to kill a deputy, if the deputy lawfully resisted their unlawful

2  attempt to break Goldberg out of jail," was sufficient to support Petitioner's conviction for

3  conspiracy to commit first degree murder.  (docket # 1-2 at 12)  Contrary to Petitioner's

4  suggestion, the Court of Appeals' separate finding that sufficient evidence supported

5  Petitioner's conviction for conspiracy to commit escape, was unrelated to its finding that

6  sufficient evidence supported his conviction for conspiracy to commit first-degree murder.

7  (docket # 1-2 at 9-10)

8         As the appellate court found, sufficient evidence supports Petitioner's conviction for

9  conspiracy to commit first-degree murder.  Petitioner was charged with conspiracy to

10 commit first degree murder, pursuant to A.R.S. §§ 13–1003 and 13–1105.  Under A.R.S. §

11 13–1105 (2000), a person commits first degree murder if "[i]ntending or knowing that the

12 person's conduct will cause death, the person causes the death of another with

13 premeditation." A person commits conspiracy if, "with the intent to promote or aid the

14 commission of an offense, such person agrees with one or more persons that at least one of

15 them or another person will engage in conduct constituting the offense and one of the

16 parties commits an overt act in furtherance of the offense, except that an overt act shall not

17 be required if the object of the conspiracy was to commit any felony upon the person of

18 another." A.R.S. § 13–1003.  Thus, the "state must prove as elements that the defendant

19 intended to kill and entered into an agreement with a coconspirator to commit the crime of

20 murder." *State v. Anderson*, 210 Ariz. 327, 111 P.3d 369, 387 (Ariz. 2005).  The appellate

21 court found that the evidence showing "the conspirators intended to kill a deputy, if the

22 deputy lawfully resisted their unlawful attempt to break Goldberg out of jail, was sufficient

23 to support [Petitioner's] conviction for conspiracy to commit first-degree murder."  (docket

24 # 1-2 at 12)  Petitioner has not established that the appellate court's determination was

25 contrary to, or an unreasonable application of federal law, or that the appellate court's

26 determination was based on an unreasonable determination of the facts in light of the

27 evidence presented at trial.  *See* 28 U.S.C. § 2254(d)(1).

28

1    The Due Process Clause of the Fourteenth Amendment "protects the accused against

2    conviction except upon proof beyond a reasonable doubt of every fact necessary to

3    constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

4    When reviewing the sufficiency of evidence to support a conviction, the court must

5    determine whether, considering the evidence in the light most favorable to the prosecution,

6    any rational trier of fact could have found the defendant guilty of the essential elements of

7    the crime beyond a reasonable doubt. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995)

8    (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  If no rational trier-of-fact could

9    find proof of guilt beyond a reasonable doubt, the petition for a writ of habeas corpus must

10   issue. *Payne v. Borg*, 982 F. 2d 335, 337 (9th Cir. 1993).

11   A federal habeas corpus petitioner "faces a heavy burden when challenging the

12   sufficiency of the evidence used to obtain a state conviction on federal due process

13   grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ,

14   the habeas court must find that the decision of the state court reflected an objectively

15   unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275.

16   "In considering a petition for a writ of habeas corpus, the district court is required to

17   'make its determination as to the sufficiency of the state court findings from an independent

18   review of the record or otherwise grant a hearing and make its own findings on the

19   merits.'" *Richmond v. Ricketts*, 774 F.2d 957, 961 (9th Cir. 1985) (quoting *Turner v.

20   Chavez,* 586 F. 2d 111, 112 (9th Cir. 1978)).  "The reviewing court must respect the

21   province of the fact-finder to determine the credibility of witnesses, resolve evidentiary

22   conflicts, and draw reasonable inferences from proven facts  by assuming that the fact-

23   finder resolved all conflicts in a manner that supports the verdict." *Walters*, 45 F.3d at

24   1358.  If the trier of fact could draw conflicting inferences from the evidence, the reviewing

25   court relies on the inference that favors conviction.  *McMillan v. Gomez*, 19 F.3d 465, 469

26   (9th Cir. 1994).  "The relevant inquiry is not whether the evidence excludes every

27   hypothesis except guilty, but whether the jury could reasonably arrive at its verdict."

28   *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (citing *United States v. Mares*,

1  940 F.2d 455, 458 (9th Cir. 1991)).  A federal court must determine the sufficiency of the

2  evidence in reference to the substantive elements of the criminal offense as defined by state

3  law.  *Jackson*, 443 U.S. at 324 n. 16.

4         The record contains sufficient evidence to support Petitioner's conviction for

5  conspiracy to commit first-degree murder.  Both Robert Olsen and Daniel England testified

6  in detail about their conversations with Goldberg and Schilinski, and their plan to help

7  Goldberg escape. (Tr. 1/10/01 at 89–124, 163–64; Tr. 1/11/01 at 7–94)  Olsen and England

8  specifically identified Schilinski, the Cofskys, and Manning as participants in the scheme.

9  (*Id.*)  Goldberg told Olsen that Cofsky, his friend and business partner, frequently updated

10 Goldberg in telephone conversations on the plan to break Goldberg out of jail.

11 (Respondents' Exh. V at 175-76, 184-185, 190)   In addition to being friends and business

12 partners, Goldberg and Cofsky were co-defendants in another case.   (Respondents' Exh. V

13 at 175-176, 184-85; Exh. W at 254; Exh. Z at 399)  Olsen and England further testified

14 regarding the details of the plan which Goldberg and Schilinski had described to them.  (Tr.

15 1/20/01 at 89-124, 163-64; Tr. 1/11/01 at 7-94)

16        The attempted jail break was planned for June 12, 2000, at 11:30 a.m., when

17 Goldberg was being transported back to jail after an appearance in Judge Steven F. Conn's

18 court.  Upon Goldberg's arrival, "two" people in a van with sliding doors were going to

19 drive by and "grab" Goldberg.   (Respondents' Exh. V at 173-74, 187-88, Exh. W at 214-

20 222; Tr. 1/20/01 at 89-124, 163-64)  If the guard escorting Goldberg interfered with the

21 escape attempt, Schiliski was to kill the guard.  (Respondents' Exh. V at 170, 172-74, 197-

22 98; Exh. W at 216-222, 239-41, 254-55)

23        Schilinksi was assigned the task of "actually kill[ing] the guard if necessary."

24 (Respondents' Exh. V at 170, 172-74, 197-99, Exh. W. at 216-222, 239-41, 254-55)   While

25 in jail in Las Vegas jail, Schilinski described the jail break plot in detail to inmate England.

26 Schilinski confirmed that he was going to shoot the guard escorting Goldberg if he resisted

27 or "made a move."  (Respondents' Exh. W at 211-220)

28

1     While Schilinski's role in the conspiracy was to shoot the guard escorting Goldberg

2    (Respondents' Exh. V at 173; Exh. W at 220, 239-41), one of Petitioner's assignments was

3    "to keep a close eye" on Schilinski to make sure he was available to participate in the

4    scheme.  (Respondents' Exh. V at 178)  In early June, Mohave County officials transferred

5    Schilinski to a jail in Las Vegas where he had outstanding traffic warrants.  (Respondents'

6    Exh. V at 177; Exh. W at 211-215)   Because he was responsible for keeping track of

7    Schilinski, Cofsky "paid [Schilinski's] fines in Las Vegas to spring him out of the Las

8    Vegas jail."  (Respondents' Exh. V at 177-78, 195-96)  Petitioner argues that there in

9    insufficient evidence to support his conviction because there is contrary evidence in the

10   record indicating that "Dave's girlfriend was supposed to pay Schilinki's bond."  (docket #

11   14 at 9) (citing Respondents' Exh. W at 237-38)  On review of a sufficiency of the

12   evidence claim, the reviewing court must respect the province of the fact finder to

13   determine the credibility of witnesses and to resolve conflicting evidence.  *Walters*, 45 F.3d

14   at 1358.  Additionally, where the trier of fact could draw conflicting inferences from the

15   evidence, the reviewing court relies on information that supports the conviction.  *McMillan*,

16   19 F.3d at 469.  Thus, testimony that someone other than Petitioner might also have been

17   "supposed to pay Schilinski's bond," does not undermine a finding that sufficient evidence

18   supported Petitioner's conviction.

19       Cofsky also "babysat" Schilinski at the Cofskys' ranch until the day of the attempted

20   jail break.  (Respondents' Exh. V at 178-79)  Cofsky and Goldberg "didn't want to lose

21   track of [Schilinski] because he was a key figure" in the plan.  (Respondents' Exh. V at

22   178)  In addition to keeping track of Schilinski, Cofsky and "Dave's [Goldberg]

23   girlfriend," would assist in the placement of the vehicles.  (Respondents' Exh. W at 230-

24   231)

25       The evening of June 11, 2000, police observed Date and co-defendant Tawanee

26   Barrett arrive at the Cofsky residence.  (Tr. 1/12/01 at 130–35; Tr. 1/18/01 at 56–58; Tr.

27   1/23/01 at 4–7)  The next morning, June 12, 2000, Date, Barrett, and conspirator Manning

28   drove to Wal-Mart and purchased .38 caliber ammunition.  (Tr. 1/12/01 at 143–49, 167–70;

Tr. 1/17/01 at 245–48; Tr. 1/18/01 at 19–23; Tr. 1/23/01 at 22–25)  They proceeded to Auto Zone, and purchased a pair of 18-inch bolt cutters. (*Id.*)  At approximately 11:00 a.m., officers observed Date, Barrett, Manning, and the Cofskys drive towards Kingman in three different vehicles, a red pickup truck, a blue van, and a black Mountaineer SUV.  (Tr. 1/11/01 at 185–90; Respondents' Exh. X at 285-86)  Officers followed the vehicles to Kingman where they drove to an old warehouse parking lot.   At the warehouse parking lot, Date and Manning removed the back seat of the minivan, and "stash[ed]" it behind the building. (Tr. 1/11/01 at 195, 154–55; Tr. 1/17/01 at 140; Tr. 1/18/01 at 76; Tr. 1/23/01 at 30)  After driving to another location where Barrett remained with one of the vehicles, Date and Manning left in the minivan, and drove towards the courthouse.  (Tr. 1/11/01 at 161–63; Tr. 1/17/01 at 118–19, 125–26; Tr. 1/18/01 at 59–64; Tr. 1/23/01 at 30–31)

Meanwhile, police observed Schilinski and the Cofskys "casing" the courthouse and jail in Kingman.  (Tr. 1/12/01 at 18–35, 74–75; Tr. 1/17/01 at 25–31, 120–24, 181–83, 190, 238–41; Tr. 1/18/01 at 61–62)  At approximately 11:00 a.m., Officers observed Schilinski walk nervously to Judge Conn's courtroom, where Goldberg was scheduled to appear, read the court's calendar, and then leave in a white Grand Am.  (Respondents' Exh. X at 257-67, 280-81; Exh. Y at 311-320, 338-346, 385-87)   About thirty minutes later, Petitioner and his wife entered Judge Conn's courtroom, even though their court proceeding was not scheduled until 1:30 p.m. that day.  (Respondents' Exh. X at 268-71, 279-82) Petitioner argues that there in insufficient evidence to support his conviction because there is contrary evidence in the record indicating that the Cofksys' court appearance had been rescheduled to an earlier time.  On review of a sufficiency of the evidence claim, the reviewing court must respect the province of the fact finder to determine the credibility of witnesses and to resolve conflicting evidence.  *Walters*, 45 F.3d at 1358.  Additionally, where the trier of fact could draw conflicting inferences from the evidence, the reviewing court relies on information that supports the conviction.  *McMillan*, 19 F.3d at 469.  Thus, evidence that Cofskys' court time might have been changed does not undermine a finding that sufficient evidence supported Petitioner's conviction.

When police officers outside of the courthouse observed the minivan drive "right in front" of the courthouse, they initiated a traffic stop. (Tr. 1/11/01 at 160–61, 193; Tr. 1/17/01 at 125–32, 242–43; Tr. 1/18/01 at 62–69)  Manning was in the driver's seat, and Date was crouched in the "back cargo area" of the van wearing "reflective sunglasses," had seven .38 caliber rounds of ammunition in his pocket, and was holding six more rounds in his hand. (Tr. 1/17/01 at 41–42, 129– 32, 244; Tr. 1/18/01 at 66; Respondent's Exh. Y at 321-325, 347-49, 372-76)  Officers found two handguns in the van, one loaded with two .38 caliber rounds of ammunition, and a pair of worn surgical gloves. (Tr. 1/17/01 at 132–35, 172–81; Tr. 1/18/01 at 67)  Inside the vehicle which Barrett was driving when she was arrested, police found: (1) two pairs of bolt cutters; (2) five .38 caliber rounds of ammunition; (3) a pair of rubber gloves similar to the pair found in the minivan; (4) a bag containing "extra large" men's clothing and a can of shaving cream (Goldberg weighed approximately 260 pounds, and had a beard) (Tr. 1/18/01, at 73); (5) cell phones; (6) two license plates; and (7) a court document bearing Eugene Cofsky's name.  (Tr. 1/17/01 at 143–162, 223; Tr. 1/18/01 at 70–73, 87; Respondents' Exh. Y at 350-371, Exh. Z at 389-393)

After arresting the Cofskys, police found, among other items, a day planner in Sheri Cofsky's purse which contained Schilinski's name, social security number, and date of birth, Manning's name and phone number, and the name, "Tracy" [Date], with a corresponding telephone number. (*Id.*)    Petitioner was carrying $10,700 in cash at the time of his arrest.  (Respondents' Exh. X at 272-73)

At the Cofskys' residence, officers found $117,500 in cash, .38 caliber shell casings, and a receipt from Wal-Mart for .38 caliber ammunition purchased on June 12, 2000 at 10:20 a.m. (Tr. 1/11/01 at 196–98; Tr. 1/12/01 at 37–41, 161–70)  Police also found a document with Eugene Cofsky's name and the notation, "left Fourth, end, park van, white

1    Grand Am," apparent driving directions to the courthouse for Petitioner and Manning.[12]

2    (*Id.*) A telephone calling card taken from Schilinski after his arrest indicated that he called

3    the Cofsky residence at 8:28 a.m. on June 12, 2000.  (Tr. 1/12/01 at 166; Tr. 1/17/01 at 48,

4    184–85; Respondents' Exh. Y at 326-337, 337-381)

5           Additionally, while in jail on the charges at issue, co-defendant Manning wrote a

6    letter addressed to "EC," which detailed a possible defense to the pending charges and

7    stated:

8           Look, EC, we were under surveillance from at least the 8th.  Think about
            it, Bro.  This story may need work, but it's the right one.  You're the one
9           who needs to slow down, and get your lawyer to get your dates back with
            our.  EC . . . you may have a good case.  But until you show me a better
10          defense, this is the one I'm going with.  So either show me or get with it.

11   (Respondents' Exh. Z at 396-97)  This letter was found in the cuff of Cofsky's pants when

12   he was in jail on the instant offense.  (Respondents' Exh. V at 206-09; Exh. Z at 394-97.)

13          Petitioner also contends that the Arizona Court of Appeals' conclusion that

14   sufficient evidence supported his conviction for conspiracy to commit first-degree murder

15   was based on an unreasonable determination of the facts, because "[t]here was no physical

16   evidence seized from Petitioner to link him with the conspiracy," and there was no

17   evidence that he specifically intended to kill a guard or agreed with another person to kill a

18   guard.  (docket # 1-2 at 47-49)

19          The Court disagrees with Petitioner's assertion.  As set forth above, there was

20   sufficient evidence to support Petitioner's conviction for conspiracy to commit first-degree

21   murder.  Surveillance of Petitioner's residence and the Kingman courthouse on June 12,

22   2000, in addition to physical evidence found in the cars used in the attempted jail break,

23   physical evidence found at Petitioner's residence, physical evidence recovered from

24

25   ───────────────

26          [12] The minivan was seen driving north on Fourth Street towards the courthouse. (Tr. 1/17/01
     at 125; Tr. 1/18/01 at 62–63)  The courthouse is located at the intersection of Fourth Street and
27   Spring Street. (*Id.*)  The minivan turned east on Spring Street and then north on Fifth Street,
     which borders the courthouse's east side. (*Id.*)  The minivan then drove through the intersection
28   of Pine Street, and then made a U-turn back towards the courthouse before being stopped. (*Id.*)

1  Petitioner while he was in jail, linked Petitioner to co-conspirators Schilinski, Manning,

2  Date, and Barrett.  (Respondents' Exh. V at 206-09, Exh. X at 257-282, 285-296; Exh. Y at

3  311-87, Exh.Z at 389-98)  Additionally, the evidence established that Petitioner had several

4  different tasks: (1) keeping Goldberg up-to-date on the plans (Respondents' Exh. V at 175-

5  76, 184-85, 190-92); (2) sitting inside the courtroom during Goldberg's hearing and

6  signaling the conspirators when the proceeding was almost over (Respondents' Exh. W at

7  247-251, Exh. X at 268-271, 279-282); (3) assisting with the placement of the vehicles

8  (Respondents' Exh. W at 227-231); and (4) keeping track of Schilinski whose task was to

9  shoot the guard if necessary.  (Respondents' Exh. V at 170-73, 177-79, 195-98; Exh. W at

10  211-222, 227-231, 239-41, 254-55)

11       Petitioner argues that the "Court of Appeals made an unreasonable determination of

12  facts because the only suspicious movements by the Petitioner were his presence in the

13  courtroom where he was scheduled to be, at the time he was told to be there by his attorney,

14  and his using the phone to call his late attorney."  (docket # 1-2 at 47)   As previously

15  stated, when a habeas court reviews the sufficiency of evidence, it court views the evidence

16  in the light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319; *McMillan*, 19 F.3d

17  at 469 (stating that if the trier of fact could draw conflicting inferences from the evidence,

18  the reviewing court will assign the inference that favors conviction.)   Here, the evidence

19  supports a reasonable inference that Petitioner was in Judge Conn's courtroom on June 12,

20  2000 because he was responsible for signaling his co-conspirators when Goldberg's hearing

21  was almost over and that he used the phone to inform the co-conspirators that the hearing

22  did not take place.

23       For the reasons set forth above, Petitioner fails to establish that the state courts'

24  rulings rejecting his sufficiency of the evidence claim were either contrary to, or based on

25  an unreasonable application of, federal law or involved an unreasonable determination of

26  the facts.  28 U.S.C. § 2254(d).  Thus, Petitioner is not entitled to habeas corpus relief on

27  Ground One.

28

**B.  Ground Two**

In Ground Two, Petitioner contends that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by failing to give a "Single Conspiracy to Commit Multiple Offenses" jury instruction.[13]   (docket # 1-2 at 51)   Petitioner alleges that the trial court's error: (a) violated his rights to a fair trial and due process by lowering the prosecution's burden of proof; and (b) violated his Sixth Amendment right to a jury determination because the Court of Appeals, not a jury, determined the scope of the conspiracy by vacating Petitioner's conviction for conspiracy to commit escape, rather than his conviction for conspiracy to commit murder.  (docket # 1-2 at 51-52)

**1.  Exhaustion Analysis**

Respondents assert that Petitioner's claims asserted in Ground Two are procedurally defaulted and barred from habeas corpus review.  The Court agrees.  As discussed below, the record reflects that Petitioner did not properly exhaust Ground 2(a) because he did not fairly present that federal claim to any Arizona court.  *See, Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005).  The record also reflects that Petitioner did not properly exhaust Ground 2(b) because he never presented that claim to the trial court or the Court of Appeals, rather he presented it for the first time to the Arizona Supreme Court.  *See, Castille*, 489 U.S. at 351.

In Ground 2(a), Petitioner argues that the trial court's failure to give a "Single Conspiracy to Commit Multiple Offenses" jury instruction[14] in accordance with R.A.J.I. 10.033 and 10.034, violated his right to a fair trial and due process by lowering the

---

[13] The extent Ground Two can be construed as challenging a jury instruction which was based on the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640 (1946), that issue has been deemed Ground Six and will be addressed in the Court's  analysis of Ground Six.  (*see* dockets # 19, # 20)

[14]  The "Single Conspiracy to Commit Multiple Offense" instruction provides, "A person who conspired to commit multiple offenses is guilty of a single conspiracy if each offense which was the object of the conspiracy arose out of the same agreement or relationship."  (docket # 1-3 at 39)

1  prosecution's burden of proof.  Petitioner claims that failure to give this instruction

2  permitted the State to obtain a conviction of conspiracy to commit murder without any

3  evidence of Petitioner's intent to commit murder.  (docket # 1-2 at 51-52)

4         At trial, Petitioner did not object to any of the conspiracy instructions.

5  (Respondents' Exh. AA at 427-29)  Accordingly, on direct appeal, Petitioner argued only

6  that the court's failure to give a "Single Conspiracy to Commit Multiple Offenses" jury

7  instruction constituted fundamental error and did not assert a federal claim.  (docket # 1-3

8  at 38-40) The appellate court resolved Petitioner's jury instruction claim solely on the basis

9  of state law.  (docket # 1-2 at 16-18)

10         Petitioner argues that his citation to *in re Winship*, 397 U.S. 358 (1970) in his

11  appellate brief was sufficient to exhaust a federal claim.  (docket # 14 at 11, n. 13)   In

12  support of this assertion, Petitioner cites page 19 of his Opening Brief.  (*Id.*)  Although that

13  page cites *Winship*, it is in support of Petitioner's claim, labeled Issue A, that there was

14  insufficient evidence to support his conviction for conspiracy to commit first degree

15  murder.  (docket # 1-3 at 28)   Petitioner's jury instruction claim, labeled Issue D, appears

16  on pages 29-31 of his Opening Brief, (*see* docket # 1-3 at 38-40), and includes no citation

17  to *Winship* or to any other federal authority.  Petitioner's citation to *Winship* in support of

18  his sufficiency of the evidence claim in his Opening Brief, did not alert the appellate court

19  that he also raised a federal challenge to the jury instructions in a separate claim that

20  appeared ten pages later.

21         Similarly, in his petition for review to the Arizona Supreme Court, Petitioner again

22  failed to raise the federal jury instruction claim he presents in Ground 2(a) of the pending

23  petition.  (docket # 1-4 at 28-40)   Rather, Petitioner joined in co-defendant Manning's

24  petition for review and argued, for the first time, that the Arizona Court of Appeals violated

25  his Sixth Amendment right to have a jury determine "any fact on which the legislature

26  conditions an increase in their maximum punishment," by vacating his conviction for

27  conspiracy to commit escape rather than requiring a jury to decide whether "the most

28

1   serious offense conspired to was first degree murder."  (docket #  1-4 at 37-38,

2   Respondents' Exh. N at 99)

3        Although Petitioner argued on direct appeal that the trial court erred by failing to

4   instruct the jury on a single conspiracy with multiple offenses, he did not base that claim on

5   federal law.  (Respondents' Exh. AA at 427-29, docket # 1-2 at 16-18, docket # 1-3 at 38-

6   40, docket # 1-4 at 8-24, 37; Respondents' Exh. N. at 99) *See Castillo*, 399 F.3d at 999

7   (stating that to properly exhaust a federal claim, petitioner "must have characterized the

8   claims he raised in state proceedings specifically as federal claims.") (internal citations

9   omitted)  Because Petitioner did not raise the jury instruction claim raised in Ground 2(a) of

10  the pending petition as a federal claim before the state courts, he did not properly exhaust

11  that claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (stating that it is not enough that all

12  the facts necessary to support the federal claim were before the state courts or that a

13  "somewhat similar state law claim was made.")  As discussed below in Section IV.B.2,

14  *infra*, Petitioner's claim raised in Ground 2(a) is procedurally barred.

15       Petitioner also failed to properly exhaust the Ground 2(b) in which he argues that the

16  trial court's failure to give a "Single Conspiracy to Commit Multiple Offenses" jury

17  instruction denied him his Sixth Amendment right to a jury determination because the

18  Court of Appeals, not a jury, determined the scope of the conspiracy by vacating

19  Petitioner's conviction for conspiracy to commit escape, rather than his conviction for

20  conspiracy to commit murder.  (docket # 1-2 at 51-52)

21       Petitioner did not present this federal claim to the trial court or the Arizona Court of

22  Appeals.  Rather, he raised this claim for the first time to the Arizona Supreme Court in a

23  petition for discretionary review.  (Respondents' Exh. N at 99, docket # 1-4 at 37-38)

24       Generally, a petitioner satisfies the exhaustion requirement by fairly presenting a

25  federal claim to the appropriate state courts in the proper manner.  *Vasquez*, 474 U.S. at

26  257.  In *Castille*, the Supreme Court noted that petitioner had raised only state law claims

27  to the intermediate state appellate court, and held that "where the [federal] claim has been

28  presented for the first and only time in a procedural context in which its merits will not be

1    considered unless there are special and important reasons . . . [r]aising the claim in such a

2    fashion does not . . . constitute fair presentation." *Castille*, 489 U.S. at 351.

3          Based on *Castille*, Petitioner did not properly exhaust Ground 2(b) because he

4    raised that claim for the first time in a petition for discretionary review to the Arizona

5    Supreme Court.  (docket # 1-4 at 37; Respondents' Exh. N at 99)  Petitioner never

6    presented Ground 2(b) to the trial court or the Arizona Court of Appeals.  (docket # 1-3 at

7    38-40, docket # 1-4 at 8-24)  As discussed below, Ground 2(b) is procedurally defaulted

8    because Petitioner cannot now return to state court to properly exhaust that claim.

9            **2.  Ground Two - Procedural Default Analysis**

10          Petitioner did not properly present his federal claims raised in Ground Two to the

11    state courts and any attempt to return to state court to present those claims would be futile

12    because they would be procedurally barred pursuant to Arizona law.  First, Petitioner is

13    time-barred under Arizona law from raising these claims in a successive petition for post-

14    conviction relief  because the time for filing a notice of post-conviction relief has long

15    expired. *See* Ariz.R.Crim.P. 32.1 and 32.4 (a petition for post-conviction relief must be

16    filed "within ninety days after the entry of judgment and sentence or within thirty days after

17    the issuance of the order and mandate in the direct appeal, whichever is later.")  Although

18    Rule 32.4 does not bar dilatory claims if they fall within the category of claims specified in

19    Ariz.R.Crim.P 32.1(d) through (h), Petitioner has not asserted that any of these exceptions

20    apply to him.  Moreover, a state post-conviction action is futile where it is time-barred.

21    *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *Moreno v. Gonzalez*, 116 F.3d 409,

22    410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for

23    dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under

24    Rule 32.2(a)).

25          Furthermore, under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, a

26    defendant is precluded from raising claims that could have been raised on direct appeal or

27    in any previous collateral proceeding. *See Krone v. Hotham*, 181 Ariz. 364, 366, 890 P.2d

28    1149, 1151 (1995) (capital defendant's early petition for post-conviction relief raised

1   limited number of issues and waived other issues that he could have then raised, but did

2   not); *State v. Curtis*, 185 Ariz. 112,113, 912 P.2d 1341, 1342 (App. 1995) ("Defendants are

3   precluded from seeking post-conviction relief on grounds that were adjudicated, or could

4   have been raised and adjudicated, in a prior appeal or prior petition for post-conviction

5   relief."); *State v. Berryman*, 178 Ariz. 617, 624, 875 P.2d 850, 857 (App. 1994)

6   (defendant's claim that his sentence had been improperly enhanced by prior conviction was

7   precluded by defendant's failure to raise issue on appeal).  The aforementioned

8   unexhausted claims could have, and should have, been properly raised either on direct

9   appeal or on post-conviction review.  Accordingly, the State court would find Petitioner's

10  claims raised in Ground Two procedurally barred.

11      Because Petitioner's claims raised in Ground Two are procedurally defaulted, they

12  are barred from federal habeas review absent a showing of "cause and prejudice" or a

13  "fundamental miscarriage of justice."  To establish "cause," a petitioner must establish that

14  some objective factor external to the defense impeded his efforts to comply with the state's

15  procedural rules. *Id.*  The following objective factors may constitute cause: (1) interference

16  by state officials, (2) a showing that the factual or legal basis for a claim was not

17  reasonably available, or (3) constitutionally ineffective assistance of counsel. *Id.*

18  Prejudice is actual harm resulting from the constitutional violation or error. *Magby v.*

19  *Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  Where petitioner fails to establish cause for

20  his procedural default, the court need not consider whether petitioner has shown actual

21  prejudice resulting from the alleged constitutional violations. *Smith v. Murray*, 477 U.S.

22  527, 533 (1986).

23      Petitioner does not articulate any basis to overcome the procedural bar.  As a general

24  matter, Petitioner's *pro se* status at any time during his state post-conviction and federal

25  proceedings and ignorance of the law do not satisfy the cause standard. *Hughes v. Idaho*

26  *State Bd. of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986); *Tacho v. Martinez*, 862 F.2d

27  1376, 1381 (9th Cir. 1988); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1988).

28  Petitioner offers no legitimate "cause" which precluded him from properly exhausting his

1  state remedies.  Accordingly, the Court declines to reach the issue of prejudice.  *Engle*, 456

2  U.S. at 134 n. 43.

3        A federal court may also review the merits of a procedurally defaulted habeas claim

4  if the petitioner demonstrates that failure to consider the merits of his claim will result in a

5  "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A

6  "fundamental miscarriage of justice" occurs when a constitutional violation has probably

7  resulted in the conviction of one who is actually innocent.  *Id.*

8        This gateway "actual innocence" claim differs from a substantive actual innocence

9  claim.  *Smith v. Baldwin*, 466 F.3d 805, 811-12 (9th Cir. 2006).  The Supreme Court

10  described the gateway showing in *Schlup v. Delo*, 513 U.S. 298, 315-16 (1995) as a less

11  stringent standard than a substantive claim of actual innocence. *See also Carriger v.*

12  *Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (suggesting that a "habeas petitioner asserting a

13  freestanding innocence claim must go beyond demonstrating doubt about his guilt and must

14  affirmatively prove that he is innocent.").  If petitioner passes through the *Schlup* gateway,

15  the court is only permitted to review his underlying constitutional claims.  *Smith*, 466 F.3d

16  at 807.  The fundamental miscarriage of justice exception applies only to a "narrow class of

17  cases" in which a petitioner makes the extraordinary showing that an innocent person was

18  probably convicted due to a constitutional violation.  *Schlup v. Delo*, 513 U.S. 298, 231

19  (1995).  To demonstrate a fundamental miscarriage of justice, Petitioner must show that "a

20  constitutional violation has resulted in the conviction of one who is actually innocent."

21  *Schlup*, 513 U.S. at 327.  To establish the requisite probability, Petitioner must prove with

22  new reliable evidence that "it is more likely than not that no reasonable juror would have

23  found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 324, 327.  New

24  evidence presented in support of a fundamental miscarriage of justice may include

25  "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

26  evidence that was not presented at trial."  *Id.* at 324; *see also, House v. Bell*, 547 U.S. 518

27  (2006)(stating that a fundamental miscarriage of justice contention must involve evidence

28  that the trial jury did not have before it).

1    Petitioner does not assert that failure to consider his claims raised in Ground Two

2    will result in a fundamental miscarriage of justice.  Additionally, the record does not

3    establish that, in light of newly discovered evidence, "it is more likely than not that no

4    reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*,

5    513 U.S. at 324, 327.

6        In accordance with the foregoing, Petitioner's claims raised in Ground Two are

7    procedurally defaulted and barred from federal habeas corpus review.  Moreover, those

8    claims lack merit as discussed below.

9        **3.  Merits Review of Ground Two**

10       In Ground Two Petitioner argues that, in view of the court's failure to given a

11   "single conspiracy to commit multiple offenses" instruction in accordance with RAJI

12   10.033 and 10.034, the indictment was multiplicatus because it charged multiple counts for

13   a single offense.  (docket # 1-2 at 51) Petitioner claims that the State charged "two separate

14   conspiracies and present[ed] evidence of one conspiracy with multiple events. . ." and that

15   the failure to give an Single Conspiracy with Multiple Offenses instruction permitted the

16   State "to divid[e] one conspiracy into two thereby increasing Petitioner's exposure to

17   conviction."  (docket # 1-2 at 51)

18       "An indictment is multiplicatus when it charges multiple counts for a single offense,

19   producing two penalties for one crime and thus raising double jeopardy questions." *United*

20   *States v. Stewart*, 420 F.3d 1007, 1012 (9th Cir.2005).  Multiplicity is a defect in the

21   indictment; therefore, a conviction will not be reversed unless the defendant was

22   prejudiced.  *See United States v. Severino*, 316 F.3d 939, 943 (9th Cir.2003).  Here,

23   although the indictment was multiplicatus, any prejudice Petitioner may have suffered was

24   cured when the Arizona Court of Appeals vacated Petitioner's conviction and sentence on

25   conspiracy to commit escape.  *See United States v. Davenport*, 519 F.3d 940 (9th Cir. 2008)

26   (finding that offense of possessing child pornography was lesser included offense of receipt

27   of child pornography, and thus entering judgment against defendant on separate counts for

28   receiving child pornography and possessing child pornography was multiplicatus, in

1  violation of Fifth Amendment's prohibition of double jeopardy and remanding to the

2  district court to vacate defendant's conviction on one of the two counts and allowing that it

3  be reinstated without prejudice if his other conviction should be overturned on direct or

4  collateral review).

5      Liberally construing the Petition, Petitioner also argues that, under the Fifth

6  Amendment's double jeopardy clause, he cannot be subject to multiple punishment on

7  multiplicatus charges.  (docket # 1-2 at 52, citation to cases)   Petitioner cites *Braverman v.*

8  *United States*, 317 U.S. 49 (1942), in which the Supreme Court stated that "one agreement

9  cannot be taken to be several agreements and hence several conspiracies because it

10  envisages the violation of several statutes rather than one . . . . The single agreement is the

11  prohibited conspiracy, and however diverse its objects it violates but a single statute . . . .

12  For such a violation, only the single penalty prescribed by the statute can be imposed." *Id.*

13  at 53-54.  *See also United States v. Licciardi*, 30 F.3d 1127, 1131 (9th Cir.1994) (holding

14  that indictment is multiplicatus if it charges multiple conspiracies when there is only a

15  single conspiracy to violate two statutes); *Launius v. United States*, 575 F.2d 770, 771 (9th

16  Cir.1978) (*per curiam*) (holding that consecutive sentences imposed on multiplicatus

17  counts, two counts of conspiracy for one drug smuggling enterprise, violated the Double

18  Jeopardy Clause).

19      In this case, the Court of Appeals found that "the record reflects that there was only

20  one conspiracy and that the most serious offense to which the defendant conspired was

21  first-degree murder." (docket # 1-2 at 17)  The Arizona Court of Appeals, therefore,

22  vacated the less serious of the two convictions, conspiracy to commit escape, and the

23  related sentence.  (*Id.*) (noting that "[w]hen it is obvious which of two multiplicatus

24  conspiracy counts cannot stand, an appellate court need not remand the conviction to be

25  vacated but may simply do so itself.")

26      In accordance with United States Supreme Court precedent, the Ninth Circuit

27  recognizes that when a defendant has been convicted and sentenced on multiplicatus

28  charges, "[t]he conviction as well as the sentence on one of the two multiplicatus counts

1    must be vacated, to 'avoid both the punitive collateral effects of multiple convictions as

2    well as the direct effects of multiple sentences.'" *United States v. Alerta*, 96 F.3d 1230,

3    1239 (9th Cir. 1996), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053

4    (9th Cir. 2000) (quoting *United States v. Anderson*, 850 F.2d 563, 569 (9th Cir. 1988) and

5    quoting *United States v. Palafox*, 764 F.2d 558, 564 (9th Cir. 1986)); *see also Rutledge v.*

6    *United States*, 517 U.S. 292 (1996) (holding that "[a] guilty verdict on a § 848 charge

7    necessarily includes a finding that the defendant also participated in a conspiracy violative

8    of § 846; conspiracy is therefore a lesser included offense. . . . we adhere to the

9    presumption that Congress intended to authorize only one punishment. Accordingly, 'one

10   of [petitioner's] convictions, as well as its concurrent sentence, is unauthorized punishment

11   for a separate offense' and must be vacated.'") (internal citation omitted).

12        Here, because the Arizona Court of Appeals already vacated one of Petitioner's

13   convictions and the related sentence, he has been afforded the relief to which he is entitled

14   and, therefore, is not entitled to further relief based on his challenge to the indictment or

15   based on the trial court's failure to instruct the jury regarding a single conspiracy with

16   multiple offenses.

17        **C.  Ground Three - Ineffective Assistance of Appellate Counsel**

18        In his third ground for relief, Petitioner argues that counsel on direct appeal was

19   "ineffective for failing to cite the *Evanchyk* [*v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (Ariz.

20   2002)] case in support of issue I," in violation of his Sixth Amendment right to counsel.

21   (docket # 1-2 at 53)   Respondents concede that Petitioner properly exhausted this claim

22   and that is properly before this Court on habeas corpus review.  (docket # 10 at 38; docket #

23   1-5 at 15, 44, 58)

24        **1.  Background**

25        On post-conviction review, Petitioner argued that pursuant to *Evanchyk*, his

26   conviction for conspiracy to commit first degree murder is invalid and that counsel's failure

27   to cite that case on direct appeal was ineffective assistance of counsel.  (docket # 1-5 at 15)

28

1    The trial court first analyzed and rejected Petitioner's claim that *Evanchyk* "was a

2  significant change in the law which would probably have changed the outcome of his case

3  if applied thereto."  (docket # 1-2 at 23-24)  The court explained that:

> The issue in *Evanchyk* was whether a defendant could be guilty
> of Conspiracy to Commit First Degree Murder where it was asserted
> that he conspired to commit the crime only under the felony-murder
> theory as opposed to the premeditation theory.  The Arizona Supreme
> Court held that he could not and held that in Arizona there is no such
> crime as conspiracy to commit felony-murder, first degree murder.  The
> Court went on to affirm that one can be guilty of Conspiracy to Commit
> First Degree Murder if one intended to kill or promote or aid in killing
> and made an agreement to kill.  In reaching the latter conclusion, the
> Arizona Supreme Court relied on appellate opinions dating back as far
> as 1981.
>
> The holding that a conviction for conspiracy to commit a first
> degree murder based solely on a felony-murder theory could not stand
> was new law in Arizona . . . [Petitioner] in this case, however, was not
> convicted under such a theory.  The only theory the jury was instructed
> on in this case was the premeditation theory.  To the extent that *Evanchyk*
> was new law regarding conspiring to commit first degree murder under
> a felony-murder theory, it is not applicable to the facts of this case and
> would have no impact on the outcome of this case.
>
> The holding in *Evanchyk* that conspiring to commit first degree
> [murder] is a specific intent crime is not new law and is not inconsistent
> with the instructions given in this case . . . .  The jury was instructed that
> [Petitioner] had to intend to promote or aid the commission of First Degree
> Murder.  The jury was instructed that First Degree Murder required that
> one act intentionally or knowingly and with premeditation . . . .  The jury
> in this case would have been instructed no differently had *Evanchyk*
> already been decided.  It was not a decision which would have affected
> the outcome of this case.  The Court determines that *Evanchyk v. Stewart*
> is not new law which would have applied to and changed the outcome of
> this case. [Petitioner] is not entitled to post-conviction [relief] on such claim.

(docket # 1-2 at 23-24)

The trial court then specifically addressed, and rejected, Petitioner's claim of

ineffective assistance of appellate counsel which was based on *Evanchyk*.

> [Petitioner's] second claim for relief is that his appellate attorney
> was ineffective for failing to cite *Evanchyk*.  That case was decided on
> May 24, 2002.  The Memorandum Decision of the Court of Appeals was
> not issued until October 29, 2002.  The Court has already ruled that
> *Evanchyk* was not new law that would have affected the outcome of this case.
> There is no need to repeat the Court's prior analysis of this issue.  Failure to
> bring this case to the attention of the Court of Appeals could not have been
> ineffective because the appellate court would have recognized its lack of
> relevance to the proceedings in this case. [Petitioner] is not entitled to relief
> on his claim that appellate counsel was ineffective for failing to bring the

1     *Evanchyk* decision to the attention of the appellate court.

2     (docket # 1-2 at 25)

3          In his petition for review to the Arizona Court of Appeals and the Arizona Supreme

4     Court, Petitioner again argued that he was denied his Sixth Amendment right to the

5     effective assistance of counsel because appellate counsel failed to cite *Evanchyk*.  (docket #

6     1-5 at 44, 58)   The appellate court and the Arizona Supreme Court both summarily denied

7     review.  (docket # 1-2 at 28, 29)  Thus, the trial court's decision on post-conviction review

8     is the last reasoned decision of the state courts.  *See LaJoie v. Thompson*, 217 F.3d 663, 669

9     n. 7 (9th Cir. 2000).

10         **2.   Merits Review of Ground Three - Ineffective Assistance of Appellate Counsel**

11

12         As discussed below, Petitioner is not entitled to habeas corpus relief on his claim

13    that appellate counsel was ineffective because he has not shown the state court's decision

14    was contrary to, or involved an unreasonable application of, clearly established federal law.

15    Additionally, Petitioner has not shown that the state court's decision was based on an

16    unreasonable determination of the facts in light of the evidence presented at trial.  28

17    U.S.C. § 2254(d).

18         The *Strickland* framework for analyzing ineffective assistance of counsel claims is

19    the clearly established federal law for purposes of 28 U.S.C. § 2254(d).  *Williams (Terry) v.

20    Taylor*, 529 U.S. 362, 404-08 (2000) (citing *Strickland v. Washington*, 466 U.S. 668,

21    687–94 (1984)).  To prevail on a Sixth Amendment ineffective assistance of counsel claim,

22    petitioner must establish that: (1) counsel's performance fell below an "objective standard

23    of reasonableness" under the prevailing professional norms; and (2) that he was prejudiced

24    by counsel's performance.  *Strickland*, 466 U.S. at 687–94.  To establish prejudice,

25    petitioner must show "a reasonable probability that, but for his counsel's unprofessional

26    errors, the result of the proceeding would have been different."  *Id.* at 694.  The *Strickland*

27    test applies to claims of ineffective assistance of appellate counsel.  In such a case,

28    petitioner establishes prejudice by showing that, but for counsel's deficient performance,

the outcome of his appeal would have been different.  *Smith v. Robbins*, 528 U.S. 259 (2000).

When analyzing *Strickland's* performance prong, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. *Strickland*, 466 U.S. at 690.  Review of counsel's performance under *Strickland* is "extremely limited. The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998).  Thus, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Petitioner must satisfy both the performance and the prejudice prongs.  *Strickland*, 466 U.S. at 691–92; *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) (burden is on defendant to show prejudice).  A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. *Robbins*, 528 U.S. at 286. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* (quoting *Strickland*, 466 U.S. at 697).

Even assuming appellate counsel's failure to cite *Evanchy*k on direct appeal constituted deficient performance, Petitioner must also show that, but for counsel's failure to cite that case, a reasonable probability exists that the outcome of Petitioner's appeal would have been different. *Robbins*, 528 U.S. 259.

As previously discussed, in *Evanchyk v. Stewart*, 340 F.3d 933, 1118 (9th Cir. 2003), the federal court certified to the Arizona Supreme Court the issue of whether the felony murder rule applies to a charge of conspiracy to commit first-degree murder.  *Evanchyk*, 47 P.3d 1114, 1115-16.   The Arizona Supreme Court described the issue as "whether one can be convicted of conspiracy to commit first-degree murder when the state does not prove that the killing was committed with premeditation but only that it occurred in the course

1   and furtherance of committing one of the underlying felonies." *Evanchyk*, 47 P.3d at 1117,

2   1119.  The Arizona Supreme Court concluded that proof of intent to commit the underlying

3   felony in a case of felony murder is not sufficient to support a conviction for conspiracy to

4   commit first-degree murder.  *Evanchyk*, 47 P.3d at 1117, 1119.  In reaching that conclusion,

5   the court relied on Arizona precedent to articulate the elements of conspiracy to commit

6   premeditated first-degree murder as: "the state must prove that the defendant had the intent

7   to promote the offense of murder and an agreement with another one that will do the actual

8   killing."  47 P.3d at 1117.

9         Unlike the petitioner in *Evanchyk*, Petitioner was charged and convicted of

10  conspiracy to commit premeditated first-degree murder, not felony murder.   The State did

11  not assert a felony-murder theory of conspiracy against Petitioner or his co-defendants.

12  Likewise, the trial court did not instruct the jury that an unintentional killing during the

13  commission of a felony could support a conviction for conspiracy to commit first-degree

14  murder.   Rather, the trial court instructed the jury regarding the statutory elements of

15  conspiracy to commit first degree murder, including the requirement that the jury find that

16  Petitioner intended to "cause the death of another person" "with premeditation."

17  (Respondents' Exh. Q at 123, 127; Respondents' Exh. JJ )  The court also defined

18  "premeditation" as defined as acting with "either the intention or the knowledge that he or

19  she will kill another human being, when such intention or knowledge precedes the killing

20  by any length of time to permit reflection."  (Respondents' Exh. Q at 129)   The court

21  instructed the jury that it was required to find beyond a reasonable doubt that Petitioner

22  intended to kill another human being and agreed with at least one other conspirator to kill.

23  (Respondents' Exh. Q at 123, 127, 129)   The jury instructions required the jury to find

24  both a specific intent to kill and an agreement to kill.  Under the facts of this case, the

25  principle stated in *Evanchyk* - that proof of intent to commit the underlying felony in felony

26  a murder case is not sufficient for a conspiracy to commit first-degree murder - does not

27  apply.   Because *Evanchyk* does not apply to Petitioner's case, appellate counsel's failure to

28  cite that case did not constitute ineffective assistance.

On direct appeal, the Arizona Court of Appeals found that sufficient evidence supported Petitioner's conviction for conspiracy to commit first-degree murder applying the elements of premeditated first-degree murder: (1) a person causes the death of another; (2) with premeditation; (3) by conduct that such person intends or knows will cause death. (docket # 1-2 at 11)   Based on the elements of premeditated murder, the appellate court reasoned, a defendant who enters into an agreement to cause the death of another "premeditates a killing, even though a conviction for conspiracy does not require an actual murder occur."  (docket # 1-2 at 11)  Applying the law regarding conspiracy to commit first-degree, premeditated murder, the Arizona Court of Appeals held that the State presented sufficient evidence of Petitioner's intent to kill and of his agreement with at least one other co-conspirator to kill.  (docket # 1-2 at 12) Contrary to Petitioner's assertion, the Arizona Court of Appeals' finding that sufficient evidence supports Petitioner's conviction for conspiracy to commit first-degree murder was not based on Petitioner's intent to commit felony escape.

Petitioner further argues that the Arizona courts "made an unreasonable determination of the facts" and "an unreasonable application of federal law" by rejecting his ineffective assistance of appellate counsel claim because (1) *Evanchyk* "clearly does address conspiracy to [commit] first-degree premeditated murder;" (2) "the *Evanchyk* case was used by the Court of Appeals in two co-defendants' case[s];" and (3) appellate "counsel did recognize *Evanchyk's* importance and did try to have it applied."  (docket # 1-2 at 54)  Petitioner's arguments lack merit.

First, although Petitioner is correct that *Evanchyk* discusses the crime of conspiracy to commit first-degree premeditated murder, it merely summarizes Arizona law regarding the elements of that crime and does not articulate any new law applicable to conspiracy to commit premeditated first-degree murder.  *Evanchyk*, 47 P.3d at 116-17.  Second, Petitioner has not presented evidence in support of his assertion that "the *Evanchyk* case was used by the Court of Appeals in two co-defendants' case[s]."  (docket # 1-2 at 54) There is no evidence that the Court of Appeals relied on *Evanchyk* to vacate his co-

1    defendants' convictions for conspiracy to commit first degree murder.   Rather, the

2    appellate court's decision in co-defendant Date's appeal does not cite *Evanchyk* and affirms

3    Date's conviction for conspiracy to commit first-degree murder.  (Respondents' Exh. K at

4    38, 51-55)   Likewise, the appellate court affirmed co-defendant Manning's conviction for

5    conspiracy to commit first degree murder and cited *Evanchyk* for the proposition that "a

6    person can be convicted as a conspirator on proof that he or she intended a specific offense

7    and agreed to promote that offense even if the offense was never completed."

8    (Respondents' Exh. L at 64-65)  Petitioner has failed to carry his burden of showing that

9    the state court's factual determinations are unreasonable.  *See Woodford v. Viscotti*, 537

10   U.S. 19, 25 (2002) (*per curiam*) (stating that petitioner bears the burden of proving state

11   court's factual determinations are unreasonable in light of the evidence.).

12          Finally, Petitioner claims that appellate counsel attempted to bring the *Evanchyk*

13   decision to the appellate court's attention, but filed a notice of supplemental authority in the

14   wrong case.  The record supports Petitioner's assertion that appellate counsel filed a

15   supplemental citation of authority in the wrong case.  (docket # 1-2 at 68-69)   However,

16   because *Evanchyk* does not apply to Petitioner's conviction for conspiracy to commit

17   premeditated first degree murder, appellate counsel's failure to cite that case on appeal and

18   her failure to file the supplemental citation of authority in the correct case, do not give rise

19   to a claim of ineffective assistance of counsel.   *See Juan H. v. Allen*, 408 F.3d 1262, 1273

20   (9th Cir. 2005) (noting that counsel is not ineffective for failing to raise a meritless claim).

21   In view of the foregoing, Petitioner is not entitled to habeas corpus relief based on his

22   claims raised in Ground III.

23          **D.  Ground Four - Confrontation Clause**

24          In his fourth ground for relief, Petitioner argues that "[a]dmission of out of court

25   statements by an alleged co-conspirator violated [his] right to confront witnesses under the

26   6th and 14th Amendments."  (docket # 1 at 9, docket # 1-2 at 55)   Respondents concede that

27   Petitioner properly exhausted this claim and that it is properly before this Court on habeas

28   corpus review.  (docket # 10 at 44)

**1. Relevant Background**

Before trial, Petitioner moved to preclude England's testimony about statements made to him by co-conspirator Schilinski regarding the escape/murder.  (Respondents' Exh. R at 151, Exh. S at 153-54)   Following a hearing, the trial court denied the motion *in limine* explaining that:

> My feeling is that aside from the confrontation issue, that I have heard avow[als] made during various hearings in this case that would suggest to me that the State is going to be able to establish the existence of a conspiracy short of statements that were necessarily made by Mr. Schlinisky to Mr. England.  Granted these are going to be circumstantial, but I believe that at least from what I've heard that there would be sufficient evidence that would eventually be presented in this case to allow the statements made by Mr. Schilinksy  to Mr. England to be admissible as statements made by a co-conspirator during the course of and in furtherance of the conspiracy.

(Respondents' Exh. U at 161-62; Exh. T at 155-56)

Petitioner challenged this ruling on direct appeal arguing that the trial court erred by permitting England to testify regarding Schilinksi's statements because they were hearsay and were not admissible under any hearsay exception or as non-hearsay statements of a coconspirator.  (docket # 1-3 at 33-35; docket # 1-4 at 22)

The appellate court rejected Petitioner's claim finding that:

> Statements made by a co-conspirator in the course or furtherance of a conspiracy are not hearsay.  Ariz.R.Evid. 801(d)(2)(E); *see State v. White*, 168 Ariz. 500, 506, 815 P.2d 869, 875 (1991).  When inquiring into whether a statement by a co-conspirator was made in furtherance of a conspiracy, we focus on the intent of the declarant in advancing the goals of the conspiracy, rather than whether the statement had the actual effect of advancing those goals.  *State v. Dunlap*, 187 Ariz. 441, 458, 930 P.2d 518, 535 (App. 1996).  As long as some reasonable basis exists for concluding that the statement furthered the conspiracy, the "in furtherance" requirement is satisfied.  *Id.*  When it has been shown both that a conspiracy exists and that the defendant and the declarant are parties to the conspiracy, such statements are admissible.  *Id.*  Under this co-conspirator rule, there is no Confrontation Clause requirement that the declarant be unavailable to testify.  *United States v. Inadi*, 475 U.S. 387, 394-96 (1986).
>
> [Petitioner] does not contend that Schilinsky was not a party to a conspiracy to break Goldberg out of the Kingman jail.  Rather, he contends that Schilinsky's statements amounted to mere bragging not meant to further the conspiracy.  It does appear that Schilinsky was boastful and something of a braggart.  After arriving at the Las Vegas jail, he mysteriously told England to "watch the six o' clock news."  Nevertheless, the record is clear that Schilinsky disclosed the actual details of the escape plan, the timing, the location, and the names of two of the men involved, in order to enlist

1
2

England's help in making bail.  We hold that the statements were made in furtherance of the conspiracy and were, therefore, admissible.

(docket # 1-2 at 13-14)   Following the Arizona Court of Appeals' denial of Petitioner's

3

claim, Petitioner sought review in the Arizona Supreme Court which denied review without

4

comment.  (docket # 1-4 at 29, docket # 1-2 at 22) Thus, the Arizona Court of Appeals'

5

decision is the last reasoned decision of the state courts.

6

### 2.  Merits Review of Ground IV - Confrontation Clause Claim

7

Petitioner is not entitled to habeas corpus relief based on Ground Four because he

8

has not established that the state court's decision was contrary to, or involved an

9

unreasonable application of, clearly established federal law.   28 U.S.C. § 2254(d).  The

10

state court's conclusion that Schilinski's statements to England were non-hearsay

11

statements made by a co-conspirator in the course or furtherance of a conspiracy was not an

12

unreasonable application of clearly established federal law.  Petitioner has also failed to

13

show that the state court's decision was based on an unreasonable determination of the

14

facts in light of the evidence presented.  28 U.S.C. § 2254(a).

15

The Sixth Amendment guarantees an accused the right "to be confronted with

16

witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (quoting the Sixth

17

Amendment of the United States Constitution).  "The central concern of the Confrontation

18

Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting

19

it to rigorous testing in the context of an adversary proceeding before the trier of fact."

20

*Maryland v. Craig*, 497 U.S. 836, 845 (1990).

21

The Confrontation Clause, however, may yield where an unavailable declarant's

22

out-of-court statements bear sufficient indicia of reliability.  In *Mattox v. United States*, 156

23

U.S. 237 (1895), the Supreme Court recognized that the framers of the Constitution

24

"obviously intended to . . . respec[t]" certain unquestionable rules of evidence in drafting

25

the Confrontation Clause.  156 U.S. at 243.  Relying on *Mattox*, courts have permitted the

26

admission of out-of-court statements which fall within a firmly rooted exception to the

27

hearsay rule.  *Ohio v. Roberts*, 448 U.S. 56 (1980).  Where a declarant's statement falls

28

1    under a firmly rooted hearsay exception, the Sixth Amendment's residual "trustworthiness"

2    test allows the admission of the declarant's statements. *Idaho v. Wright*, 497 U.S. 805, 820

3    (1990) (stating that "if a declarant's truthfulness is so clear from the surrounding

4    circumstances that the test of cross-examination would be of marginal utility, then the

5    hearsay rule does not bar admission of the statement at trial.")

6        In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court redefined the

7    test, that it had previously articulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), for the

8    admissibility of a testimonial statement by an unavailable hearsay declarant. *Id.* The

9    *Crawford* Court held that the government cannot introduce out-of-court *testimonia*l

10   evidence against a defendant in a criminal trial unless the declarant is unavailable at trial

11   and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. 36,

12   68. Although the term "testimonial" is central to the *Crawford* Court's decision, it left "for

13   another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* The

14   Court, however, referred to the definition of testimony as "'[a] solemn declaration or

15   affirmation made for the purpose of establishing or proving some fact.'" *Id.* (quoting 1 N.

16   Webster, An American Dictionary of the English Language (1828)).   The *Crawford* Court

17   also suggested that testimonial statements can be defined as "*ex parte* in-court testimony or

18   its functional equivalent — that is material such as affidavits, custodial examinations, prior

19   testimony that the defendant was unable to cross-examine or similar pretrial statements that

20   declarants would reasonably expect to be used prosecutorially." *Crawford*, 541 U.S. at 51-

21   52. The Court also referred to Justice Thomas' earlier definition of "testimonial

22   statements" as "'extrajudicial statements . . . contained in formalized testimonial materials,

23   such as affidavits, depositions, prior testimony, or confessions.'" *Id.* at 52 (quoting *White v.

24   Illinois*, 502 U.S. 346, 365 (1992)(Thomas, J., concurring)).   Finally, the Court gave several

25   specific examples of obviously testimonial statements with which the Sixth Amendment is

26   concerned — namely "prior testimony [given] at a preliminary hearing, before a grand jury,

27   or at a former trial; and to  police interrogations." *Id* at 52.  The Supreme Court noted that

28   "the principal evil at which the Confrontation Clause was directed [is the] civil-law mode

1    of criminal procedure, and particularly its use of *ex parte* communication as evidence

2    against the accused." *Id.* at 51.  The Court agrees with Respondents' assertion that

3    *Crawford* does not apply to this case.  (docket # 10 at 47).  First, the Supreme Court has

4    specifically held that *Crawford* does not apply retroactively to convictions that were

5    pending on collateral review at the time *Crawford* was issued.  *Whorton v. Bockting*, 549

6    U.S. 406 (2007).  Petitioner's conviction became final on September 28, 2003, several

7    months before *Crawford* was issued on March 8, 2004.  (*see* docket # 10 at 10-12)

8         Additionally, *Crawford* only applies to testimonial evidence and Schilinski's

9    challenged statements are not testimonial.  *See Leavitt v. Arave*, 383 F.3d 809, 830 n. 22

10   (9th Cir. 2004).  *Crawford* specifically explained that "statements in furtherance of a

11   conspiracy" are "by their nature" not testimonial.  *Crawford*, 541 U.S. at 56; *see also*

12   *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005) (stating that "co-conspirator

13   statements are not testimonial and therefore beyond the compass of *Crawford's* holding.");

14   Fed.R.Evid. 801(d)(2)(E) (stating that co-conspirator statements are not "hearsay");

15   Ariz.R.Evid. 801 (d)(2)(E) (same).  As discussed below, Schilinski's statements pertain to

16   the logistics and details of the jailbreak/murder plan and were made in furtherance of that

17   plan, therefore, they are not testimonial.

18        Because *Crawford* does not apply to Petitioner's Confrontation Clause claim, the

19   Court will consider that claim under *Ohio v. Roberts*, 448 U.S. 56 (1980).   In *Roberts*, the

20   Supreme Court established guidelines for determining whether out-of-court statements

21   satisfy the requirements of the Confrontation Clause.  Under *Roberts*, an out-of-court

22   statement is admissible if the prosecution demonstrates both the unavailability of the

23   declarant and that the out-of-court statement has an "indicia of reliability."  *Roberts*, 448

24   U.S. at 66.  The *Roberts* requirements are less stringent when the out-of-court statement is

25   made by a co-conspirator.  First, when the declarant is a co-conspirator, the party offering

26   the statement need not demonstrate that the declarant is unavailable.  *United States v. Inadi*,

27   475 U.S. 387, 395-400 (1986).  Additionally, the reliability requirement can be inferred

28   where the evidence falls within a firmly rooted hearsay exception.  *Idaho v. Wright*, 497

1  U.S. 805, 815 (1990).  The co-conspirator exception to the hearsay rule is "firmly enough

2  rooted in [its] jurisprudence that . . . a court need not independently inquire into the

3  reliability of such statements."  *Bourjaily v. United States*, 483 U.S. 171, 183 (1987).

4          In this case, Petitioner aruges that the "Court of Appeals made an unreasonable

5  determination of the facts when it determined that [Schilinski's statements] were made in

6  furtherance of conspiracy" because the statements at issue "were idle bragging."  (docket #

7  1-2 at 55-56)   The Court disagrees.  As set forth below, the record indicates that the

8  Arizona Court of Appeals' determination that Schilinski's statements were made in

9  furtherance of the conspiracy was not an unreasonable determination of the facts in view of

10  the evidence presented at trial.  *See* 28 U.S.C. § 2254.

11          In early 1999, England and Schilinski were in jail together in Mohave County,

12  Arizona.  (Respondents' Exh. W at 212)  Both were subsequently transferred to jail in Las

13  Vegas.  Because England worked as a "module trustee" in the Las Vegas Jail, he had

14  "extra" telephone privileges.  (Respondents' Exh. W at 213)  England was working the day

15  Schilinski arrived in the Las Vegas jail and saw him walk by with the "new guys" who

16  were "coming in."  (Respondents' Exh. W at 212-213)   Within Schilinski's first 24 hours

17  in the Las Vegas jail, he got in trouble with an officer and was placed in lockdown.

18  (Respondents' Exh. W at 211-214)   Because of his lockdown status, Schilinski asked

19  England to call someone for him to arrange Schilinski's release from jail.  (Respondents'

20  Exh. W at 214-15, 231-32)   Schilinski explained that he needed England's help to secure

21  his release quickly because he was supposed to help "break somebody out of jail" in

22  Kingman, Arizona at 11:30 a.m. on June 12, 2000. (Respondents' Exh. W at 214-19, 236-

23  37)   Schilinski told England the details of the plan including the date and time, the

24  sequence of events, the location, the amount of money Schilinski would receive for his

25  participation, the names of two of the men involved (Goldberg and "Eugene" whose last

26  name rhymed with "ski"), and that the plan included Schilinski shooting the guard

27  escorting Goldberg if necessary.  (Respondents' Exh. W at 216-224, 239-41, 245-46)  After

28  Schilinski told England about the plan, England tried to telephone a woman whose

1   telephone number Schilinski had given him, but got an answering machine.  (Respondents'

2   Exh. W at 223, 237-238)

3         Schilinski's statements to England were made to facilitate his release from jail so he

4   could participate in the conspiracy.  Thus, those statements were made in furtherance of the

5   conspiracy and were properly admitted at trial.  *See Bourjaily*, 483 U.S. at 180 (stating that

6   a co-conspirator's statements can, by themselves, be probative of the existence of a

7   conspiracy and the participation of both petitioner and the declarant in the conspiracy.)  The

8   Court of Appeals' resolution of the facts was not unreasonable in view of the foregoing

9   evidence.

10        Additionally, Petitioner has not shown that the Arizona Court of Appeals' resolution

11  of Petitioner's Confrontation Clause claim was either contrary to or rested on an

12  unreasonable application of federal law.  28 U.S.C. § 2254(d).  The State presented

13  evidence that Schilinski and Petitioner were co-conspirators.  The State also presented

14  evidence that Schilinski's statements were made in furtherance of the conspiracy, which

15  included a plan to kill a guard if necessary.  *See Bourjaily*, 483 U.S. at 175 (stating that

16  before admitting co-conspirator's statements as an exception to the hearsay rule, there must

17  be evidence that there was a conspiracy and that the statement was made during the course

18  of an in furtherance of the conspiracy.)

19        Petitioner argues that the appellate court's decision affirming the admission of

20  Schilinski's statements was "contrary to federal law," because "[t]here is no record of

21  Schilinski being unavailable to testify" and "England was not invited to join the

22  conspiracy."  (docket # 1-2 at 55)  Petitioner's claim lacks merit.  The Supreme Court has

23  held that the admission of out-of-court statements made by a non-testifying co-conspirator

24  does not violate the Confrontation Clause and that, in such a case, the unavailability

25  requirement does not apply.  *See Wright*, 497 U.S. 814-15; *Inadi*, 475 U.S. 394-400.

26  Additionally, the admissibility of co-conspirator statements does not depend on whether the

27  statements were made between co-conspirators.  *See* Fed.R.Evid. 801(d)(2); Ariz.R.Evid.

28  801(d)(2).

1    The Court concludes that Petitioner has failed to show that the state court's denial of

2    Petitioner's Confrontation Clause claim was contrary to, or an reasonable application of,

3    applicable federal law.  Additionally, Petitioner has not shown that the state court's

4    determination was based on an unreasonable determination of the facts. 28 U.S.C. §

5    2254(d).  Accordingly, Petitioner is not entitled to habeas corpus relief on Ground Four.

6          **E. Ground Five - Recusal**

7          In Ground Five, Petitioner argues that the Honorable Steven F. Conn's failure to

8    recuse himself *sua sponte* from Petitioner's trial violated his Fourteenth Amendment rights

9    to a fair trial and due process.  (docket # 1 at 10, docket # 1-2 at 57-58)  Specifically,

10   Petitioner contends that Judge Conn should have recused himself because: (A) he saw

11   Petitioner enter the courtroom on June 12, 2000, the morning of the planned

12   jailbreak/murder;[15] and (B) "Judge Conn's court reporter of 14 years [testified at trial as] a

13   state witness."  (docket # 1-2 at 57-58)

14         Respondents argue that both Ground 5(a) and 5(b) are unexhausted and procedurally

15   defaulted because Petitioner failed to present those claims to the Arizona Supreme Court.

16   (docket # 10 at 53-54)  As previously discussed, Petitioner was not required to present his

17   federal claims to the Arizona Supreme Court to exhaust those claims.  *See* Section II.A,

18   *supra*. The Court finds that Petitioner's failure to present Grounds 5(a) and (b) to the

19   Arizona Supreme Court did not result in a procedural bar to those claims.

20         Respondents alternatively argue that federal habeas review of Grounds 5(a) and 5(b)

21   is procedurally barred because Petitioner did not fairly present those claims to the state

22   courts.  The Court will discuss this issue below.

23         **1.  Exhaustion/Procedural Bar**

24         In Ground 5(a), Petitioner argues that Judge Conn's failure to recuse himself *sua*

25   *sponte* violated Petitioner's due process rights because he witnessed Petitioner enter the

26

27         [15]   Judge Conn was assigned to preside over Goldberg's change-of-plea hearing on June 12,

28   2000, and received advance notice of  the planned jailbreak. (Tr.1/19/01 at 186)

1  courtroom on June 12, 2000, the morning of the planned jailbreak/murder.  (docket # 1-2 at

2  57-58)  He further argues that the Court of Appeals considered Petitioner's act of "entering

3  the courtroom" proof of Petitioner's involvement in the conspiracy.  (docket # 1-2 at 57) As

4  discussed below, Petitioner did not exhaust this claim because he never raised this federal

5  claim to the state courts.  In Ground 5(b), Petitioner argues that Judge Conn's failure to

6  recuse himself violated Petitioner's due process rights because his court reporter testified as

7  a State's witness at Petitioner's trial and her status as Judge Conn's court reporter

8  "bolstered her testimony" and "made the State and the court appear as one."  (docket # 1-2

9  at 58) As discussed below, Petitioner did not properly exhaust this claim because he did not

10  present this legal theory - improper bolstering - to the state courts.

11      Petitioner neither moved for a change of judge for cause nor otherwise requested

12  that Judge Conn recuse himself at any time during trial.  On direct appeal, Petitioner

13  asserted that Judge Conn's failure to recuse himself *sua sponte* violated his right to due

14  process because Judge Conn "stated that he was 'familiar with the procedural relationship'

15  between [Petitioner's] current and prior felony charges" and Judge Conn's "court reporter

16  of many years was called to testify about the court's calendar on the day of the attempted

17  escape."  (docket # 1-2 at 15-16, docket # 1-3 at 35-38, docket # 1-4 at 22)

18      The Arizona Court of Appeals rejected these claims explaining that:

19      Although a judge is required to 'disqualify himself or herself in a proceeding
        in which the judge's impartiality might reasonably be questioned,' we do not
20      believe that this is such a case.  See Ariz.R.Sup.Ct. 81, Canon 3(E) (specifying
        situations in which judges must recuse themselves).  First, a trial court's
21      knowledge of the 'procedural relationship' between two cases does not render
        that court biased.  Second, the reporter's testimony regarding undisputed
22      calendar matters could not have possibly resulted in court bias.  A trial judge
        is presumed to be free of bias and prejudice. [*State v.*] *Medina*, 193 Ariz. 504,
23      510, ¶ 11, 975 P.2d 94, 100 (1999). [Petitioner] has failed to present evidence
        to rebut this presumption.

24  (docket # 1-2 at 16)

25      Petitioner sought review in the Arizona Supreme Court.  (docket # 1-4 at 37)  He

26  argued, on the basis of state law, that the Judge Conn "should have recused himself."

27  (Respondents' Exh. N at 100)  Petitioner did not present the same factual allegations or

28

- 64 -

1   legal theory to the State courts that he presents in Grounds 5(a) and (b) of the pending

2   petition.

3          Although Petitioner challenged Judge Conn's failure to recuse himself in state court,

4   he did so based on factual allegations other than those asserted in Ground 5(a) and based on

5   a legal theory other than that asserted in Ground 5(b).  Accordingly, federal habeas review

6   of those factual assertions is procedurally barred.  *See Anderson,* 459 U.S. at 6-7; *Gray,* 518

7   U.S. at 162-63 (stating that "for purposes of exhausting state remedies, a claim for relief in

8   habeas corpus must include reference to a specific federal constitutional guarantee, as well

9   as a statement of the facts that entitle the petitioner to relief."); *Kelly v. Small,* 315 F.3d

10   1063, 1067-69 (9th Cir. 2003) (finding unexhausted ineffective assistance of counsel and

11   prosecutorial misconduct claims were specific instances of ineffectiveness and misconduct

12   asserted in federal petition were neither in the California Supreme Court petition nor

13   discussed by the Court of Appeals), *overruled on other grounds, Robbins v. Carey*, 481

14   F.3d 1143 (9th Cir. 2007); *Gauf v. Ontiveres*, No. CV-06-804-PHX-DGC (JCG), 2007 WL

15   1713287, * 5 (D.Ariz. June 12, 2007) (noting that presentation of one set of operative facts

16   in support of a federal claim does not properly exhaust the same federal claim based on a

17   different set of facts); *Anderson*, 459 U.S. at 6-7 (petitioner does not satisfy the exhaustion

18   requirement if he presents new legal theories or factual claims in a federal petition for writ

19   of habeas corpus); *Beard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1999) (stating that the

20   exhaustion requirement is not satisfied if petitioner presents new legal theories or factual

21   claims for the first time in his federal petition.)

22          Petitioner did not properly present any of the federal claims raised in Ground Five to

23   the state courts and any attempt to return to state court to present those claims would be

24   futile because they would be procedurally barred pursuant to Arizona law.  First, Petitioner

25   is time-barred under Arizona law from raising these claims in a successive petition for post-

26   conviction relief  because the time for filing a notice of post-conviction relief has long

27   expired. *See* Ariz.R.Crim.P. 32.1 and 32.4 (a petition for post-conviction relief must be

28   filed "within ninety days after the entry of judgment and sentence or within thirty days after

1   the issuance of the order and mandate in the direct appeal, whichever is later.")  Although

2   Rule 32.4 does not bar dilatory claims if they fall within the category of claims specified in

3   Ariz.R.Crim.P 32.1(d) through (h), Petitioner has not asserted that any of these exceptions

4   apply to him.  Moreover, a state post-conviction action is futile where it is time-barred.

5   *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *Moreno v. Gonzalez*, 116 F.3d 409,

6   410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for

7   dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under

8   Rule 32.2(a)).

9        Furthermore, under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, a

10  defendant is precluded from raising claims that could have been raised on direct appeal or

11  in any previous collateral proceeding. *See Krone v. Hotham*, 181 Ariz. 364, 366, 890 P.2d

12  1149, 1151 (1995) (capital defendant's early petition for post-conviction relief raised

13  limited number of issues and waived other issues that he could have then raised, but did

14  not); *State v. Curtis*, 185 Ariz. 112,113, 912 P.2d 1341, 1342 (App. 1995) ("Defendants are

15  precluded from seeking post-conviction relief on grounds that were adjudicated, or could

16  have been raised and adjudicated, in a prior appeal or prior petition for post-conviction

17  relief."); *State v. Berryman*, 178 Ariz. 617, 624, 875 P.2d 850, 857 (App. 1994)

18  (defendant's claim that his sentence had been improperly enhanced by prior conviction was

19  precluded by defendant's failure to raise issue on appeal).  The aforementioned

20  unexhausted claims could have, and should have, been properly raised either on direct

21  appeal or on post-conviction review.   Accordingly, the State court would find Petitioner's

22  claims raised in Ground Five procedurally barred.

23       As set forth above, Petitioner's claims raised in Ground Five are procedurally

24  defaulted and barred from federal habeas review absent a showing of "cause and prejudice"

25  or a "fundamental miscarriage of justice."  To establish "cause," a petitioner must establish

26  that some objective factor external to the defense impeded his efforts to comply with the

27  state's procedural rules.  *Id*.  The following objective factors may constitute cause: (1)

28  interference by state officials, (2) a showing that the factual or legal basis for a claim was

1    not reasonably available, or (3) constitutionally ineffective assistance of counsel.  *Id.*

2    Prejudice is actual harm resulting from the constitutional violation or error.  *Magby v.*

3    *Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  Where petitioner fails to establish cause for

4    his procedural default, the court need not consider whether petitioner has shown actual

5    prejudice resulting from the alleged constitutional violations.  *Smith v. Murray*, 477 U.S.

6    527, 533 (1986).

7         Petitioner does not articulate any basis to overcome the procedural bar.  As a general

8    matter, Petitioner's *pro se* status at any time during his state and federal proceedings and

9    ignorance of the law do not satisfy the cause standard. *Hughes v. Idaho State Bd. of*

10   *Corrections*, 800 F.2d 905, 908 (9th Cir. 1986); *Tacho v. Martinez*, 862 F.2d 1376, 1381

11   (9th Cir. 1988); *Martinez-Villareal*, 80 F.3d at 1306.  Petitioner offers no legitimate

12   "cause" which precluded him from properly exhausting his state remedies.  Accordingly,

13   the Court declines to reach the issue of prejudice.  *Engle*, 456 U.S. at 134 n. 43.

14        A federal court may also review the merits of a procedurally defaulted habeas claim

15   if the petitioner demonstrates that failure to consider the merits of his claim will result in a

16   "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A

17   "fundamental miscarriage of justice" occurs when a constitutional violation has probably

18   resulted in the conviction of one who is actually innocent.  *Id.*  This gateway "actual

19   innocence" claim differs from a substantive actual innocence claim.  *Smith v. Baldwin*, 466

20   F.3d 805, 811-12 (9th Cir. 2006).  The Supreme Court described the gateway showing in

21   *Schlup*, 513 U.S. at 315-16, as a less stringent standard than a substantive claim of actual

22   innocence. *See also Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)(suggesting that a

23   "habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating

24   doubt about his guilt and must affirmatively prove that he is innocent.").  If Petitioner

25   passes through the *Schlup* gateway, the court is only permitted to review his underlying

26   constitutional claims.  *Smith*, 466 F.3d at 807.  The fundamental miscarriage of justice

27   exception applies only to a "narrow class of cases" in which a petitioner makes the

28   extraordinary showing that an innocent person was probably convicted due to a

constitutional violation. *Schlup v. Delo*, 513 U.S. 298, 231 (1995).  To demonstrate a

fundamental miscarriage of justice, Petitioner must show that "a constitutional violation has

resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327.  To

establish the requisite probability, Petitioner must prove with new reliable evidence that "it

is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt." *Schlup*, 513 U.S. at 324, 327.  New evidence presented in support of a

fundamental miscarriage of justice may include "exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence that was not presented at

trial." *Id.* at 324, *see also, House v. Bell*, 547 U.S. 518 (2006) (stating that a fundamental

miscarriage of justice contention must involve evidence that the trial jury did not have

before it).  Petitioner does not assert that failure to consider his claims raised in Ground

Five will result in a fundamental miscarriage of justice.  Additionally, the record does not

establish that, in light of newly discovered evidence, "it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*,

513 U.S. at 324, 327.  Thus, Petitioner has not established any basis to overcome the

procedural bar to federal review of the Ground Five.  Moreover, Petitioner's claims raised

in Ground Five do not entitle him to habeas corpus relief.

### 2.  Merits Review of Ground 5(a)

In Ground 5(a), Petitioner argues that Judge Conn's failure to recuse himself *sua*

*sponte* violated his due process rights because Judge Conn witnessed Petitioner enter the

courtroom on the morning of the planned jailbreak, a fact the Court of Appeals relied on in

finding sufficient evidence to support Petitioner's conviction for conspiracy to commit

escape.  (docket # 1-2 at 57)   Petitioner also argues that Judge Conn was biased against

him based on Judge Conn's denial of Petitioner's Rule 20 motion.  (docket # 1-2 at 57-58)

Most issues regarding a judge's qualifications to hear a case are not constitutional

ones. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986); *FTC v. Cement Inst.*, 333

U.S. 683, 702 (1948) (stating that "most matters relating to judicial disqualification [do] not

rise to a constitutional level.").  "Rather, these questions are, in most cases, answered by

1  common law, statute, or the professional standards of the bench and bar." *Bracy v.*

2  *Gramley*, 520 U.S. 899, 904 (1997) (citing *Aetna*, 475 U.S. at 820-821; 28 U.S.C. §§ 144,

3  455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)).  However, "the . . Due

4  Process Clause requires a 'fair trial in a fair tribunal' . . . before a judge with no actual bias

5  against the defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S at

6  904-05 (citations omitted).  *See also*, *In re Murchison*, 349 U.S. 133, 136 (1955).

7       The determination of judicial bias is a factual question to which the federal courts

8  defer on habeas review.  *See* 28 U.S.C. § 2254(d); *Villafuerte v. Stewart*, 111 F.3d 616, 632

9  (9th Cir. 1997) (stating that state court's finding of lack of judicial bias was entitled to a

10  presumption of correctness.)  To succeed on a judicial bias claim, a petitioner must

11  "overcome a presumption of honesty and integrity in those serving as adjudicators."

12  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The Supreme Court has stated that "opinions

13  formed by the judge on the basis of facts introduced or events occurring in the course of the

14  current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality

15  motion unless they display a deep-seated favoritism or antagonism that would make fair

16  judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

17       Petitioner has offered no evidence to overcome the "presumption of honesty and

18  integrity" that is accorded the determinations of a judge. *Withrow*, 421 U.S. at 47.

19  Although Judge Conn had knowledge of the planned escape attempt, there is no evidence

20  that this knowledge resulted in "deep-seated favoritism or antagonism that would make fair

21  judgment impossible." *Liteky*, 510 U.S. at 555.  Additionally, contrary to Petitioner's

22  suggestion, Judge Conn did not offer any evidence at Petitioner's trial and the Court of

23  Appeals did not rely on any actions or statements of Judge Conn to support its conclusion

24  that sufficient evidence supported Petitioner's conviction.  The Court of Appeals' decision

25  does not state that Judge Conn witnessed Petitioner enter his courtroom on the day of the

26  planned escape attempt.  (docket # 1-2 at 14-15)  Rather, the Court of Appeals relied on

27  Officer Severson's testimony that Petitioner and "his wife entered the courtroom where

28  Goldberg was scheduled to appear."  (docket # 1-2 at 6-7, 10)

1   Additionally, although Judge Conn made rulings which were unfavorable to

2 Petitioner, such as denying his Rule 20 motion, bias can "almost never" be demonstrated

3 solely on the basis of a judicial ruling. *Liteky*, 510 U.S. at 555.  Rather, a judge's remarks

4 or opinions will not demonstrate bias unless they "reveal such a high degree of favoritism

5 or antagonism as to make fair judgment impossible." *Id.*

6   Petitioner's allegation that Judge Conn "received information from the extrajudicial

7 source of a murder conspiracy," (docket # 1-2 at 57), also fails to establish that Judge

8 Conn's failure to recuse himself gave rise to a violation of Petitioner's constitutional rights.

9 The record contains no evidence that Judge Conn's ruling on Petitioner's Rule 20 motion

10 was based on any information other than the evidence presented at trial.  (Respondents'

11 Exh. AA at 401-26)   Judge Conn's ruling on Petitioner's Rule 20 motion reflects that he

12 considered the factual and legal issues and does not reveal any bias.  (Respondents' Exh.

13 AA at 420-23)

14   Finally, even if Judge Conn appeared biased because law enforcement officers

15 informed him that Goldberg would not be brought to court on the day of the planned

16 jailbreak/murder, and Judge Conn saw Petitioner enter his courtroom that same day, the

17 mere appearance of bias does not violate the Due Process Clause.  *See Withrow*, 421 U.S. at

18 46; *Aetna Life Insurance*, 475 U.S. at 821-22; *Sewer Alert Committee v. Pierce County*, 791

19 F.2d 796, 798 (9th Cir. 1986) (*per curiam*) (holding that recusal not required merely

20 because of judge's prior acquaintance with defendants).

21   Petitioner is not entitled to habeas corpus relief on his claim in Ground 5(a) that

22 Judge Conn's failure to recuse himself *sua sponte* violated the Due Process Clause.

### 3.  Merits Review of Ground 5(b)

24   In Ground 5(b), Petitioner argues that Judge Conn erred in failing to recuse himself

25 *sua sponte* because Petitioner was "prejudiced" by the testimony of Judge Conn's court

26 reporter at his trial.  (docket # 1-2 at 58)

27   During Petitioner's trial, Judge Conn's court reporter, Sandra Brice, testified that

28 Goldberg and the Cofskys were scheduled to appear on June 12, 2000 before Judge Conn.

1   (Respondents' Exh. EE, Tr. 1/12/01 at 210-216)  Petitioner claims that Brice's status as

2   Judge Conn's court reporter, "bolstered her testimony . . . and made the State and the court

3   appear was one."  (docket # 1-2 at 58)

4        The Court of Appeals rejected Petitioner's claim that Judge Conn should have

5   recused himself because his court reporter testified about the court's calendar on the day of

6   the attempted escape.  (docket # 1-2 at 16) On the basis of Arizona law that trial judges are

7   "presumed to be free of bias and prejudice," the Court of Appeals determined that Ms.

8   Brice's "testimony regarding undisputed calendar matters could not have possibly resulted

9   in court bias."  (docket # 1-2 at 16)   The appellate court's ruling that Petitioner must show

10  actual bias or prejudice on the part of Judge Conn was neither contrary to, nor an

11  unreasonable application of federal law.  *See Aenta Life Ins. v. Lavoie*, 475 U.S. 813, 821-

12  22 (1986) (stating that Due Process Clause requires a fair trial before a judge with no actual

13  bias against defendant or an interest in the outcome of his particular case).  Additionally,

14  the appellate court's decision was not based on an unreasonable determination of the facts

15  in light of the evidence at trial because the record confirms that Ms. Brice's testimony

16  regarding Judge Conn's June 12, 2000 calendar was undisputed.  (Respondents' Exh. X at

17  297-309)

18        Additionally, Petitioner's claim that Ms. Brice's testimony was "bolstered" by her

19  position as Judge Conn's court reporter and "made the State and the court appear as one,"

20  does not warrant habeas corpus relief.  (docket # 1-2 at 58)   The Supreme Court has never

21  held that actual bias is shown simply because a member of the judge's staff presents

22  undisputed evidence as a State's witness. *See, Aetna*, 475 U.S. at 821-22.   Petitioner's

23  contention that Ms. Brice's testimony was bolstered by Judge Conn's directive that she

24  "stick around for the hearings we still have to do," (Respondents' Exh. EE, Tr. 1/12/01 at

25  221), does not constitute improper bolstering of Ms. Brice's testimony because the jury had

26  already been informed that Ms. Brice was Judge Conn's court reporter.  (Respondents'

27  Exh. X at 297-309)   Finally, Petitioner does not contend that Ms. Brice's testimony

28  regarding Judge Conn's calendar on June 12, 2000 was not disputed.  (docket # 1-2 at 16)

1    The defense presented no evidence to dispute Brice's testimony that Goldberg was

2    scheduled to appear in Judge Conn's courtroom at 11:30 a.m. on June 12, 2000.  (Tr.

3    1/12/2001 at 214-16)  Thus, even if Ms. Brice's testimony was in some way "bolstered,"

4    Petitioner would not have been prejudiced because her testimony was undisputed.

5        **F.  Ground VI - *Pinkerton* Jury Instruction**

6        In Ground VI (*see* dockets # 18-20), Petitioner contends that his due process rights

7    were violated by the trial court's jury instruction that "a conspirator is liable for all criminal

8    acts committed by a co-conspirator during and in furtherance of the conspiracy" (the

9    *Pinkerton* instruction) because this instruction lowered the State's burden of proof and

10   permitted the jury to convict Petitioner of conspiracy to commit first-degree murder without

11   finding that Petitioner himself had the requisite intent to support a conviction for

12   conspiracy to commit first-degree murder.  Respondents assert that this claim is

13   procedurally barred or, alternatively, lacks merit.  (docket # 19)

14       As an initial matter, the Court notes that Respondents have not conceded exhaustion

15   with respect to Petitioner's challenge to the *Pinkerton* jury instruction.  Petitioner's

16   Petition, drafted *pro se*, did not specifically challenge the *Pinkerton* jury instruction.

17   (docket # 1)  Rather, in Ground I Petitioner presented a sufficiency of the evidence claim

18   arguing that the State "presented insufficient evidence to permit a reasonable factfinder to

19   find Petitioner guilty of conspiracy to commit [first-degree] murder beyond a reasonable

20   doubt in violation of the Due Process clause of the Fourteenth Amendment."  (docket # 1 at

21   6)  In their Response, Respondents conceded that Petitioner had exhausted this claim.

22   (docket # 10)

23       In his Reply, drafted by counsel, Petitioner recast Ground I as follows: The state

24   court violated Petitioner's Due Process Rights under the Fourteenth Amendment of the

25   United States Constitution by giving a jury instruction that invited the jury to find Cofsky

26   guilty based upon insufficient evidence."  (docket # 14 at 4)  Contrary to Petitioner's

27   assertion in his Reply, Respondents did not concede that Petitioner had properly presented

28   this claim.   Indeed, Respondents could not have conceded anything with respect to

1   Petitioner's challenge to the *Pinkerton* jury instruction because that claim was not clearly

2   raised in his Petition.  (*see* dockets # 1, # 18)   Having found that Respondents have not

3   waived the exhaustion defense to Ground VI, the Court will next consider that claim.

4          **1.  Exhaustion/Procedural Bar Analysis**

5          The record reflects that Petitioner did not properly present his jury instruction claim

6   raised in Ground VI to the state courts.   Near the end of trial, the court and counsel

7   discussed jury instructions.  (docket #  16, Exh. HH at 146-84; Exh. II at 68-88)  The trial

8   court stated that it would instruct the jury that "a conspirator is liable for all criminal acts

9   committed by a co-conspirator during and in furtherance of a conspiracy"  (the *Pinkerton*

10  instruction).  (docket # 16, Exh. HH at 146-184, Exh. II at 68-88.  Petitioner did not object.

11  (*Id.*)

12         Petitioner concedes that he did not challenge the *Pinkerton* jury instruction on direct

13  appeal.  (docket # 20 at 3)  The record confirms this fact.  (*see* docket # 1-3 at 20; docket #

14  1-2 at 9-12)  However, Petitioner argues that he properly exhausted his *Pinkerton* jury

15  instruction claim by presenting it to the state courts on post-conviction review.  (docket #

16  20 at 3)   The record does not support this contention.  On  post-conviction review,

17  Petitioner argued that *Evanchyk v. Stewart* represents a significant change in the law

18  applicable to his case.  (docket # 1-5 at 11-13)  Petitioner conceded that conditional intent

19  was sufficient to satisfy the "intent to kill" element required to prove conspiracy to commit

20  first-degree murder.  (docket # 1-5 at 18)  However, Petitioner argued that the appellate

21  court erred in concluding that the State's evidence was sufficient to support his conviction

22  for conspiracy to commit first-degree murder because the facts cited by that court failed to

23  demonstrate Petitioner's "involvement with any plan or intent to kill anyone."  (docket # 1-

24  5 at 15)   Petitioner argued that the appellate court overlooked *Evanchyk v. Stewart*, 47 P.3d

25  1114 (2002), in which "the Arizona Supreme Court specifically rejected the *Pinkerton*

26  doctrine," and, thus, his "conviction in this matter violates *Evanchyk* and denies him Due

27  Process of Law under the Fifth and Fourteenth Amendments of the United States

28  Constitution."  (docket # 1-5 at 12-13) Petitioner specifically argued that the facts relied

1   upon by the Court of Appeals "in support of its decision on the sufficiency of the evidence"

2   "are insufficient to prove any intent on Petitioner's part to commit all of the crimes

3   contemplated by his co-conspirators."  (docket # 1-5 at 14)   Although Petitioner mentioned

4   *Pinkerto*n in his post-conviction pleadings, he did so in the context of his argument that the

5   Arizona Court of Appeals applied an improper standard in determining that the State

6   presented sufficient evidence to support his conviction for conspiracy to commit first-

7   degree murder.  (docket # 1-5 at 14) (arguing that the "continued application" of the

8   *Pinkerton* doctrine to Petitioner's case "denied him Due Process of Law."); (docket 1-5 at

9   12-13) (arguing that the Arizona Court of Appeals overlooked *Evanchyk*, in which "the

10  Arizona Supreme specifically rejected the *Pinkerton* doctrine," and, thus, his "conviction in

11  this matter violates *Evanchyk* and denies him Due Process of law.")  Petitioner neither

12  mentioned the jury instructions generally nor the *Pinkerton* instruction specifically.

13  (docket # 1-5 at 1-14)  Petitioner simply did not challenge the trial court's *Pinkerton* jury

14  instruction in his petition for post-conviction relief.  Rather, he raised a sufficiency of the

15  evidence claim based on the Court of Appeals' decision that the evidence was sufficient to

16  support his conviction for conspiracy to commit first-degree murder.

17       None of Petitioner's post-conviction pleadings presented the *Pinkerton* jury

18  instruction claim that Petitioner asserts in his federal petition.  Rather, Petitioner disputed

19  the sufficiency of the evidence.  In fact, in his Motion for Rehearing of the trial court's

20  denial of his petition for post-conviction relief, Petitioner stated that:

21       *The jury instructions are of no significance to the error in this case*.  The
         crux of Petitioner's argument is that his Rule 20 motion should have been
22       granted.  Arizona conspiracy law now requires proof of a defendant's intent
         to participate in the particular crime charged, not just a generic intent to
23       participate in the overall conspiracy.

24  (docket # 1-5 at 19) (emphasis added).

25       Likewise, in his petition for review to the Arizona Court of Appeals, Petitioner again

26  challenged the sufficiency of the evidence.  (docket # 1-5 at 22-21) Petitioner argued that

27  insufficient evidence supported his conviction of conspiracy to commit first-degree murder.

28  (docket # 1-5 at 35)  Petitioner cited *Pinkerton* in the context of his sufficiency of the

1  evidence argument, (docket # 1–5 at 36-38), but did not challenge the jury instructions.

2  Indeed, Petitioner again stated that "[t]he jury instructions are of no significance to the error

3  in this case." (docket # 1-5 at 39)  Petitioner's petition for review to the Arizona Supreme

4  Court raised the same arguments that he had presented to the trial and appellate courts.

5  (docket # 1-5 at 47-60) Petitioner did not challenge the *Pinkerton* jury instruction.

6         In summary, Petitioner did not present his current challenge to the *Pinkerton* jury

7  instruction to the state courts either on direct appeal or during post-conviction proceedings.

8  Because Petitioner did not fairly present his *Pinkerton* claim to the state courts, that claim

9  is unexhausted. *See Picard v. Connor*, 404 U.S. 270, 276 (1971); *Anderson v. Harless*, 459

10  U.S. 4, 6 (1982) (stating that "[i]t is not enough . . . that a somewhat similar state-law claim

11  was made.")  Moreover, because Petitioner cannot now return to state court to present his

12  jury instruction claim raised in Claim VI, that claim is technically exhausted and

13  procedurally barred.  *See* Ariz.R.Crim.P. 32.2, 32.4(a); *Ortiz v. Stewart*, 149 F.3d 923, 939

14  (9th Cir. 1998).  Petitioner fails to demonstrate cause and prejudice, or a fundamental

15  miscarriage of justice, to excuse his procedural default.  *Coleman*, 501 U.S. at 753.

16  Moreover, Claim VI fails on the merits as discussed below.

17     **2.  Merits Review of Ground VI - Jury Instruction Claim**

18        **a.  Relevant Background**

19        On post-conviction review, the trial court considered Petitioner's related, but

20  separate, claim that the Court of Appeals improperly applied the *Pinkerton* theory of

21  conspiracy liability in affirming Petitioner's conviction for conspiracy to commit first-

22  degree murder.   In rejecting this claim, the post-conviction court found that the jury was

23  properly instructed on conspiracy to commit first-degree murder under a premeditation

24  theory:

25        [Petitioner's] first claim for relief is *Evanchyk v. Stewart* was a significant
        change in the law which would probably have changed the outcome of the
26        case if applied thereto.  The issue in *Evanchyk* was whether a defendant
        could be guilty of Conspiracy to Commit First Degree Murder where it was
27        asserted that he conspired to commit the crime only under the felony-murder
        theory as opposed to the premeditation theory.  The Arizona Supreme Court
28        held that he could not and held that in Arizona there is no crime such as

conspiracy to commit felony-murder first degree murder.  The court went on to affirm that one can be guilty of Conspiracy to Commit First Degree Murder if one intended to kill or promote or aid in killing and made an agreement to kill.  In reaching the latter conclusion, the Arizona Supreme Court relied on appellate opinions dating back as far as 1981.

The holding that a conviction for conspiracy to commit first degree murder based solely on a felony-murder theory could not stand was new law in Arizona. . . . [Petitioner] in this case, however, was not convicted under such a theory.  The only theory the jury was instructed on in this case was the premeditation theory.  To the extent that *Evanchyk* was new law regarding conspiring to commit first degree murder under a felony-murder theory, it is not applicable to the facts of this case and would have no impact on the outcome of this case.

The holding in *Evanchyk* that conspiring to commit first degree [murder] is a specific intent crime is not new law and is not inconsistent with the instructions given in this case.  The jury was instructed that [Petitioner] had to intend to promote or aid the commission of First Degree Murder . . . . The jury was instructed that First Degree Murder required that one act intentionally or knowingly and with premeditation.  The Arizona Court of Appeals on direct appeal in this case addressed the issue of whether the conspirators had merely a conditional intent to kill.  The appellate court held that conditional intent is sufficient where the condition is one the defendant imposes but has no right to impose.  The conspirators in this case had no right to impose upon the corrections officer the condition that they would refrain from killing him as long as he peaceably surrendered his prisoner.  The jury in this case would have been instructed no differently had *Evanchyk* already been decided.  It was not a decision which would have affected the outcome of this case.  The Court determines that *Evanchyk v. Stewart* is not new law which would have applied to and changed the outcome of this case. [Petitioner] is not entitled to post-conviction [relief] on such claim.

(docket # 1-2 at 22-25)

On May 24, 2005, Petitioner filed a Motion for Rehearing, arguing that the trial court misunderstood his petition for post-conviction relief.  (docket # 1-5 at 17) Petitioner conceded that "it is sufficient in a conspiracy case to prove conditional intent," but argued that "his Rule 20 motion should have been granted" because "the State has failed to demonstrate the requisite intent necessary to convict [Petitioner] of conspiracy to commit murder."  (docket # 1-5, at 17-19)   Relying on *Evanchyk*, Petitioner argued that "Arizona conspiracy law now requires proof of a defendant's intent to participate in the particular crime charged," and the State failed to present "proof of any intent (conditional or otherwise) by Petitioner to conspire to commit murder."  (docket # 1-5 at 19)

On June 17, 2005, the trial court denied Petitioner's Motion for Rehearing:

- 76 -

> In reviewing [the] Petition, the Court notes now as it did before entering its ruling that the first paragraphs of the Petition asserts that [Petitioner] is entitled to post-conviction relief because of a significant change in the law. Because the Court had already ruled on that specific issue when raised under Rule 32 by a co-Defendant in this case, the Court's order denying post-conviction relief focused on that same issue.
>
> The Court realizes upon reading the Motion for Rehearing and rereading the original Petition that [Petitioner] is also making a slightly different and more factually-related argument, that there was insufficient evidence of his intent to conspire to commit murder. The Court feels that this issue was addressed and decided against [Petitioner] by the Court of Appeals on direct appeal. The Court of Appeals issued its decision on October 29, 2002, and presumably was aware at that time of the *Evanchyk* decision which had been issued by the Arizona Supreme Court on May 24, 2002. Cases in Arizona repudiating the *Pinkerton* doctrine of liability for crimes committed by a coconspirator were decided many years ago and [Petitioner's] guilt in this case was not based upon the *Pinkerton* doctrine anyway.

(docket # 1-2 at 16-27) After the trial court denied Petitioner's petition for post-conviction relief and for rehearing, Petitioner presented the same insufficiency of the evidence claim to the Arizona Court of Appeals and Arizona Supreme Court. Both courts summarily denied relief.

### b. Merits Review of *Pinkerton* Claim

As discussed below, Petitioner is not entitled to habeas corpus relief based on the jury instruction claim raised in Ground VI. In Ground VI, Petitioner argues that trial court erred by giving a jury instruction based on a *Pinkerton* theory of liability which is not recognized in Arizona. He argues that giving such an instruction permitted the jury to convict him of conspiracy to commit first-degree murder without finding that Petitioner himself had the requisite intent to support a conviction for first-degree murder. (docket # 1-2 at 15; docket # 14 at 6-8) Petitioner argues that the "flawed jury instruction diluted the State's burden of proof, because it did not require the jury to find beyond a reasonable doubt, that Petitioner possessed the requisite intent to commit murder." (docket # 14 at 11; docket # 1-2 at 52)

### *Pinkerton Instruction was Improperly Given*

Ground VI is based on the following jury instruction, "A conspirator is liable for all criminal acts committed by a co-conspirator during and in furtherance of the conspiracy."

1   (Respondents' Exh. Q at 137, docket # 1-2 at 15, citing Tr. 1/24/01)  This instruction is

2   based on *Pinkerton v. United States*, 328 U.S. 640 (1946), in which the Supreme Court held

3   that "a conspirator may be found responsible for crimes committed by a co-conspirator, as

4   long as the acts making up the crimes are reasonably foreseeable and are carried out in

5   furtherance of the conspiracy, even though the conspirator did not participate in their

6   commission."  *State ex rel. Woods v.Cohen*, 844 P.2d 1147, 1151 (Ariz. 1992) (discussing

7   *Pinkerton*, 328 U.S. at 645-48).  *Pinkerton* was the law in Arizona until the enactment of

8   Arizona's 1979 Criminal Code.  That Code provides that a conspirator is responsible for a

9   co-conspirator's acts only if the conspirator is an accomplice or principal.  *Cohen*, 844 P.2d

10   at 1151.  To be considered an accomplice, a conspirator must aid, counsel, agree to aid, or

11   attempt to aid in the commission of the substantive crime.  *State v. Portillo*, 876 P.2d 1151,

12   1153 (Ariz. App. 1994), *vacated in part on other grounds*, 898 P.2d 920 (Ariz. 1995).  The

13   *Pinkerton* jury instruction given in this case incorrectly suggests that under Arizona law, a

14   conspirator is criminally responsible even if the conspirator did not aid, counsel, agree to

15   aid, or attempt to aid in the substantive crime.  The Arizona Supreme Court has expressly

16   rejected a *Pinkerton* jury instruction similar to the one at issue in this case.  *Portillo*, 876

17   P.2d at 1153-54.  The Court agrees with Petitioner's assertion that the *Pinkerton* instruction

18   was improperly given in this case.  However, it did not result in a Due Process violation.

19   ***Whether Pinkerton Instruction Violated Petitioner's Right to Due Process***

20   As discussed below, the erroneously given *Pinkerton* instruction did not "so infect

21   the entire trial" that Petitioner's conviction violates due process.  *See Estelle v. McGuire*,

22   502 U.S. 62, 72-73 (1991); *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir.1993).

23   The Supreme Court has stated that, "[i]n a criminal trial, the State must prove every

24   element of the offense, and a jury instruction violates due process if it fails to give effect to

25   that requirement."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v.

26   Montana*, 442 U.S. 510, 520-521 (1979)).  However, "not every ambiguity, inconsistency,

27   or deficiency in a jury instruction rises to the level of a due process violation."  *Middleto*n,

28   541 U.S. at 437.  The issue is "'whether the ailing instruction ... so infected the entire trial

that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72

(1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  "'[A] single instruction to a

jury may not be judged in artificial isolation, but must be viewed in the context of the

overall charge.'" *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp*, 414 U.S. at

146-147).  If the jury instructions as a whole are ambiguous, the issue is whether there is a

"'reasonable likelihood that the jury has applied the challenged instruction in a way' that

violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).

Analysis of Petitioner's challenge to the *Pinkerton* instruction requires consideration

of the jury instructions as a whole.  Here, the trial court gave the following jury instructions

related to conspiracy:

> The crime of Conspiracy to Commit First Degree Murder has two elements.  In
> order to determine that the Defendant committed the crime of Conspiracy to
> commit first degree murder, you must find that, number one, the Defendant
> agreed with one or more persons that at least one of them or another person
> would engage in conduct constituting the crime of first degree murder, and
> number two, the Defendant did so with the intent to promote or aid in the
> commission of the crime of first degree murder.  (Respondents' Exh. JJ at 6-7)
>
> * * *
>
> In order to find any Defendant guilty of conspiracy to commit either first
> degree murder or escape in the first degree, it is not necessary to
> find that the Defendant actually committed either crime, only that there was
> a conspiracy to commit such crime.
>
> The crime of first degree murder has the following three elements: Number one,
> the person caused the death of another person, and number two, the person
> did so with premeditation, and number three, the person intended or knew that his
> or her conduct would cause death.  (Respondents' Exh. JJ at 8)
>
> * * *
>
> Conduct is the cause of a result when, but for the conduct, the result in question
> would not have occurred.
>
> "Premeditation" means that the Defendant acts with either the intention or the
> knowledge that he or she will kill another human being, when such intention or
> knowledge precedes the killing by any length of time to permit reflection.
> Proof of actual reflection is not required, but an act is not premeditated it if is
> the instant effect of a sudden quarrel or heat of passion.
>
> "Intentionally" or "with the intent to" means, with respect to a result or to
> conduct, that a person's objective is to cause that result or to engage in that
> conduct.
>
> "Knowingly" means, with respect to conduct or to a circumstance, that a person

is aware or believes that his or her conduct is of that nature or that the circumstance exists.  (Respondents' Exh. JJ at 9)[16]

* * *

One may become a member of the conspiracy without full knowledge of all the details of the conspiracy.  On the other hand, a person who has no knowledge of a conspiracy but happens to act in a way which furthers some object of the conspiracy does not thereby become a conspirator.

Before you find that any Defendant or other person was a member of a conspiracy, the evidence must show beyond a reasonable doubt that the Defendant or other person claimed to have been a member knowingly participated in the unlawful plan with the intent to promote or assist the carrying out of the conspiracy.

A person understanding the unlawful character of a plan who knowingly encourages, advises or assists the undertaking thereby also becomes a conspirator.

One who knowingly joins an existing conspiracy is charged with the same responsibility as an originator or instigator of the conspiracy.  In determining whether a conspiracy exists, you should consider the actions and statements of all the alleged participants.  However, *in determining whether a particular Defendant was a member of the conspiracy, you should consider only that person's acts and statements*.  A person cannot be bound by the acts or statements of another participant[] until it is established that a conspiracy existed and that that person was one of its members.

To prove the existence of a conspiracy, the State need not show the making of an express or formal agreement.  The State must only prove the elements of conspiracy as defined in the previous instruction.  *A conspirator is liable for all criminal acts committed by a co-conspirator during and in furtherance of the conspiracy*.  Acts or statements of any conspirator which do not further the conspiracy and which occur before its existence or after its termination may be considered as evidence only against the person making them.  A statement to further a conspiracy may include statements made to induce enlistment or further participation in the group's activities or statements made to prompt further action on the part of the conspirators.  A statement to further a conspiracy need not necessarily be made to a person who is an actual conspirator.  Whether a statement was made to further a conspiracy depends on the declarant's intent and not the actual effect of the statement.  Mere knowledge or approval of the object of a conspiracy without agreement to cooperate in achieving it is not enough to make one a party to a conspiracy.  The fact that persons conduct themselves in a similar manner or associate with each other or assemble together or discuss common aims does not alone prove a conspiracy.

The guilt of either Defendant cannot be established by that Defendant's mere presence at a crime scene or mere association with another person at a crime scene, even if that Defendant had knowledge that a crime was being committed

---

[16]  Respondents' Exhibit JJ, attached to docket # 16, is the January 24, 2001 trial transcript. Page 9 of that transcript is out of sequence.  Rather than following page 8, page 9 of the January 24, 2001 transcript appears between pages 40 and 41.

there.  The fact that either Defendant may have been present does not in and of itself make that Defendant guilty of the crimes charged. . . .

(docket # 16, Respondents' Exh. JJ at 12-24; docket # 10, Exh. Q. at 123, 127-29, 134-41)

In addition to the foregoing conspiracy instructions, the court have the following general instructions:

I will now tell you the rules you must follow to decide this case.  I will instruct you on the law.  It is your duty to follow the law . . .You must take account of all my instructions on the law.

You are not to pick out part of one and disregard the others.  However, after you have determined the facts, you may find that some instructions do not apply.  You must then consider the instructions that do apply, together with the facts as you have determined them.  Decide the case by applying the law in these instructions to the facts.

* * *

There are four defendants.  You must consider the evidence in the case as a whole.  However, you must consider the charge against each Defendant separately.  You must not be prejudiced against one Defendant simply because you determine that the State has proved its case against another Defendant.

(docket # 16, Exh. JJ at 3, 16; docket # 10, Exh. Q. at 113, 149)

Considered as a whole, the jury instructions are not ambiguous.  *See Estelle*, 502 U.S. at 72.  The court accurately instructed the jury on the elements of conspiracy to commit first-degree, and instructed the jury that, to convict Petitioner of conspiracy to commit first-degree murder, it could not merely find that he acted in furtherance of the conspiracy to commit escape, as Petitioner argues.  (docket # 14 at 6-7)  Specifically, the court instructed the jury that it could convict Petitioner of conspiracy to commit first-degree murder only if it found: (1) that Petitioner agreed with at least one other person that one of them or another person would commit first degree murder; and (2) that Petitioner made that agreement with the intent to promote or aid the crime of first-degree murder.  (docket # 16, Exh. JJ at 6-7; docket # 10, Exh. Q at 123)  In addition to instructing the jury on the elements of first-degree murder, the court defined "premeditation," "knowingly," and "with the intent to," which were relevant to the jury's assessment of the elements it had to consider in determining whether Petitioner was guilty of conspiracy to commit first-degree murder.  (docket # 16, Exh. JJ at 9; docket # 10, Exh. Q at 127, 129-30)

- 81 -

The court also defined the elements necessary to convict Petitioner of conspiracy to commit escape and defined the elements of "escape." (docket # 16, Exh. JJ at 7-9; docket # 10, Exh. Q at 124, 127-28)   Contrary to Petitioner's assertion (docket # 14 at 6-7), the separate jury instructions regarding conspiracy to commit first-degree murder, first-degree murder, conspiracy to commit escape, and escape made it clear that the jury could not convict Petitioner of conspiracy to commit first-degree murder based only on a finding that he was a member of a conspiracy to commit escape and that the other conspirators acted in furtherance of conspiracy to commit first-degree murder.

Several other jury instructions are also contrary to a finding that the jury relied on acts or statements of co-conspirators in determining whether Petitioner had the requisite intent to be found guilty of conspiracy to commit first-degree murder.   First, the trial court instructed the jury that, in determining whether the elements of conspiracy to commit first-degree murder were satisfied, the jury was required to find (1) "beyond a reasonable doubt" that a conspiracy to commit first-degree murder was "knowingly formed;" and (2) that Petitioner "knowingly participated in the unlawful plan with the intent to promote or assist the carrying out of the conspiracy" to commit first-degree murder by, for example, "knowingly encourag[ing], advis[ing] or assist[ing] the undertaking." (docket # 16, Exh. JJ at 12, docket # 10, Exh. Q at 134)

The court also instructed the jury that it could "consider only [Petitioner's] acts and statements" in determining whether he was a member of a conspiracy to commit first-degree murder.  The court then gave the improper *Pinkerton* instruction - that, once it was shown that Petitioner was a member of the conspiracy to commit first-degree murder, he could be liable for all criminal acts (not for all other conspiracies to which his conspirators belonged, as Petitioner argues) committed by his co-conspirators during and in furtherance of the conspiracy to commit first-degree murder. (docket # 16, Exh. JJ at 12-13, docket # 10, Exh. Q at 134, 137)   Immediately before giving the erroneous *Pinkerton* instruction, however, the court advised the jury that "[t]o prove the existence of a conspiracy" to commit first-degree murder, the State was required to "prove the elements of conspiracy as

1   defined in the previous instruction."  (docket # 16, Exh. JJ at 13, docket # 10, Exh. Q at

2   136).

3       There is no dispute that the *Pinkerton* jury instruction, (docket # 16, Exh. JJ at 13,

4   lines 11-13), is improper under Arizona law.  However, the jury instructions as a whole

5   were not ambiguous.  The jury instructions as a whole made it clear that the jury could not

6   find that Petitioner was a member of a conspiracy to commit first-degree murder based only

7   on its finding that Petitioner was a member of a conspiracy to commit escape.  Moreover,

8   because Petitioner was only charged with conspiracy and was not charged with any

9   substantive crimes, the *Pinkerton* jury instruction did not apply to him and did not result in

10  prejudice.

11      The trial court's general jury instructions also clarified the *Pinkerton* instruction by

12  explaining that the jury could not find Petitioner guilty of conspiracy to commit first-degree

13  murder if it only found that Petitioner was a member of the conspiracy to commit escape.

14  Specifically, the court instructed the jury that it must "consider each charge against each

15  defendant separately."  (docket # 16, Exh. JJ at 16; docket # 10, Exh. Q at 149) The court

16  also instructed that the jury "must not be prejudiced against one defendant simply because

17  you determine that the State has proved its case against another defendant."  (*Id.*)

18  Additionally, the jury was instructed that it could not select one, or part of one, instruction,

19  and disregard the others.  (docket # 16, Exh. JJ at 3, docket # 10, Exh. Q at 113)  Rather,

20  the court instructed the jury that, after determining the facts, it was required to apply all of

21  the instructions to the facts.  (*Id.*)

22      Morever, even assuming the jury instructions as a whole were ambiguous, there is

23  no "'reasonable likelihood that the jury has applied the challenged instruction in a way' that

24  violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).

25  Petitioner argues that a jury could have understood the *Pinkerton* instruction to mean, "if

26  the jury determined that Petitioner was guilty of conspiracy to commit escape, or that he

27  shared that specific intent to aid the escape, the . . . jurors [could] also find him guilty of the

28  separate conspiracy to commit murder, based upon the actions or statements of other

1  conspirators."  (docket # 14 at 6-7)   As discussed below, the Court disagrees with

2  Petitioner's assertion.

3         First, the trial court instructed the jury that to find Petitioner guilty of conspiracy to

4  commit first-degree murder, the State must prove, beyond a reasonable doubt, the following

5  elements: (1) that Petitioner agreed with at least one person that one of them or another

6  person would commit first-degree murder; and (2) that Petitioner made such agreement

7  with the intent to promote or aide the crime of first-degree murder.  (docket # 16, Exh. JJ at

8  8-9; docket # 10, Exh. Q at 127, 129) As set forth above, the court defined the elements of

9  first-degree murder and the terms "with the intent to," "premeditation," and "knowingly."

10  (docket # 16, Exh. JJ at 8-9, docket # 10, Exh. Q at 127, 129) The jury was specifically

11  instructed that it could not find Petitioner guilty of conspiracy to commit first-degree

12  murder unless it found (1) beyond a reasonable doubt that a conspiracy to commit first-

13  degree murder was knowingly formed; and (2) that Petitioner knowingly participated in

14  that unlawful plan with the intent to promote or assist the carrying out of the conspiracy to

15  commit first-degree murder.  (docket # 16, Exh. JJ at 12; docket # 10, Exh. Q at 134-35)

16  In view of the specific instructions defining the elements required to find Petitioner guilty

17  of conspiracy to commit first-degree murder, there is no reasonable likelihood that the jury

18  disregarded this instructions and only applied the *Pinkerton* instruction to find Petitioner

19  guilty of conspiracy to commit first-degree murder.  Thus, the *Pinkerton* instruction did not

20  give rise to a Due Process violation.

21         Second, in view of several other jury instructions, it is not reasonably likely that the

22  jury improperly concluded that, based on Petitioner's status as a member of the conspiracy

23  to commit escape, he could be found guilty of conspiracy to commit first-degree murder

24  based on his co-conspirators' actions and statements.   The court gave separate instructions

25  defining the elements of conspiracy to commit first-degree murder and conspiracy to

26  commit to escape.  (docket # 16, Exh. JJ at 6-9, docket # 10, Exh. Q at 136) The court also

27  instructed that jury that it could not "pick out one instruction or part of one and disregard

28  others."  (docket # 10, Exh. Q at 113, docket # 16, Exh. JJ)   The court instructed the jury

1    that it "must consider the charge against each defendant separately", (docket # 10, Exh. Q

2    at 149), and that "in determining whether a particular Defendant was a member of a

3    conspiracy, you should consider only that person's acts and statements."  (docket # 16,

4    Exh. JJ at 12-13; docket # 10, Exh. Q at 134) Finally, the court instructed the jury that it

5    could not "find that [Petitioner] . . . was a member of a conspiracy" unless the evidence

6    showed "beyond a reasonable doubt that a conspiracy was knowingly formed and that

7    [Petitioner] . . . knowingly participated in the unlawful plan with the intent to promote or

8    assist the carrying out of the conspiracy."  (docket # 16, Exh. JJ at 12; docket # 10, Exh. Q

9    at 134) Based on these instructions, there is no reasonable likelihood that the jury could

10   have improperly concluded that, simply because Petitioner was a member of the conspiracy

11   to commit escape, he could also be found guilty of conspiracy to commit first-degree

12   murder based on his co-conspirators' actions and statements.

13        Third, the *Pinkerton* instruction itself does not support Petitioner's claim that, "if the

14   jury determined that Petitioner was guilty of conspiracy to commit escape, or that he shared

15   that specific intent to aid the escape, the . . . jurors [could] also find him guilty of the

16   separate conspiracy to commit murder, based upon the actions or statements of other

17   conspirators."  (docket # 14 at 6-7)

18        The *Pinkerton* instruction at issue stated that a conspirator "is liable for all *criminal*

19   *acts* committed by a co-conspirator during and in furtherance of the conspiracy." (docket #

20   16, Exh. JJ at 13) (emphasis added)  The instruction does not state that a defendant who

21   belongs to one conspiracy is a member of all criminal conspiracies.  (docket # 16, Exh. JJ

22   at 13)  The language of the *Pinkerton* instruction together with the jury instructions which

23   (1) defined the distinct elements of conspiracy to commit first-degree murder and

24   conspiracy to commit escape; (2) advised that the State must separately prove each

25   conspiracy based on the applicable elements; (3) required the jury to find that Petitioner

26   knowingly participated in the conspiracy to commit first-degree murder with the intent to

27   promote or assist carrying out the conspiracy; and (4) required the jury to consider the

28

1    instructions as a whole, demonstrate that there is no reasonable likelihood that the jury

2    applied the *Pinkerton* instruction in the manner Petitioner suggests.

3         Finally, during closing argument, Petitioner's counsel emphasized that "[i]n order to

4    be guilty of conspiracy, you have to enter into an agreement, you have to agree to be part of

5    the conspiracy, you have to knowingly participate with the intent to promote it."  (docket #

6    16, Exh. JJ at 97)

7         Considering the record and the jury instructions as a whole, the Court finds that the

8    erroneous *Pinkerton* jury instruction did not give rise to a due process violation because

9    there is no "'reasonable likelihood that the jury has applied the challenged instruction in a

10   way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at

11   380).

12        *Harmless Error Analysis*

13        Even assuming that giving a *Pinkerton* jury instruction resulted in a due process

14   violation, Petitioner is not "entitled to relief unless [he] can establish that the error resulted

15   in 'actual prejudice.'" *Ho v. Carey*, 332 F.3d 587, 595 (9th Cir.2003) (quoting *United*

16   *States v. Lane*, 474 U.S. 438, 449 (1986)). "Actual prejudice" means that the error "had a

17   'substantial or injurious effect or influence in determining the jury's verdict.'"  *Id*. (quoting

18   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also California v. Roy*, 519 U.S. 2,

19   4-6 (1996) (per curiam) (holding that, on habeas review, *Brecht's* harmless error standard

20   applies to jury instructions that omit an element of the crime).  In § 2254 proceedings, the

21   federal court assesses the prejudicial impact of a constitutional error in a state-court

22   criminal proceeding under *Brecht's* more forgiving "substantial and injurious effect"

23   standard, whether or not the state appellate court recognized the error and reviewed it for

24   harmlessness under the "harmless beyond a reasonable doubt" standard set forth in

25   *Chapman v. California*, 386 U.S. 18, 24 (1967); *Fry v. Pliler*, ___ U.S.___, 127 S.Ct. 2321,

26   2328 (2007).  The Supreme Court recently clarified that *Brecht's* harmless error analysis

27   applies to instructional error. *Hedgpeth v. Pulido*, ___ S.Ct.___, 2008 WL 5055738 (Dec. 2,

28   2008).

1    Even assuming the challenged *Pinkerton* instruction violated Petitioner's due

2  process rights in this case, any error was harmless because the *Pinkerton* instruction did not

3  have "a substantial and injurious effect or influence in determining the jury's verdict."

4  *Brecht*, 507 U.S. at 637.  First, a *Pinkerton* instruction does not define the crime of

5  conspiracy, but rather defines the scope of a defendant's criminal liability for the

6  substantive offenses committed by his co-conspirators.  *See Cohen*, 844 P.2d at 1150-51

7  (distinguishing the crime of conspiracy from the substantive offenses committed by co-

8  conspirators).   A conspiracy conviction is distinct from a conviction for the substantive

9  offenses.  *See State v. Olea*, 678 P.2d 465, 478 (Ariz.Ct.App. 1983) (stating that "the

10  commission of a substantive offense and a conspiracy to commit it are separate and distinct

11  offenses.").  The *Pinkerton* instruction pertains only to culpability for the substantive

12  offenses.  *Portillo*, 876 P.2d at 1153-54 (stating that "[t]he *Pinkerton* theory of culpability

13  does not concern conspiracy, but culpability for a substantive offense.").

14    In this case, co-defendants Manning and Date were charged with conspiracy to

15  commit escape, conspiracy to commit first-degree murder, and substantive offenses (theft

16  and misconduct involving weapons).  (docket # 10, Exh. A)  Petitioner, on the other hand,

17  was charged with conspiracy to commit escape and conspiracy to commit first-degree

18  murder and was not charged with any substantive offenses.  (docket # 10, Exh. A)

19  Accordingly, the *Pinkerton* instruction did not apply to Petitioner.  The court specifically

20  instructed the jury that although it had to "take account of all [the] instructions on the law,"

21  it may "find that some instructions do not apply."  (docket # 16, Respondents' Exh. JJ at 3)

22  Because the *Pinkerton* instruction did not apply to Petitioner's conviction for conspiracy to

23  commit first-degree murder, that instruction could not have had a substantial and injurious

24  effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 637.  Additionally,

25  as previously discussed, the *Pinkerton* instruction did not lower the State's burden of proof

26  on the conspiracy to commit first-degree murder charge. (*see* Section IV.A, *supra*.)

27    In view of the evidence presented at trial, the detailed jury instructions regarding

28  conspiracy to commit first-degree murder, and the comments made by Petitioner's counsel

during closing argument which emphasized the elements of conspiracy to commit first-degree murder, the *Pinkerton* instruction did not have a substantial and injurious effect on the jury's verdict.   The State presented sufficient evidence that Petitioner intended and agreed with at least on co-conspirator to commit first-degree murder.

**V.  Conclusion**

In view of the foregoing, the Petition for Writ of Habeas Corpus (docket # 1) should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (docket # 1) be **DENIED**.

This recommendation is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1), should not be filed until the District Court enters judgment.  The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See*, 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).  Thereafter, the parties have ten days within which to file a response to the objections.  Failure timely to file objections to the Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. Fed.R.Civ.P. 72.

DATED this 29th day of December, 2008.

Lawrence O. Anderson
United States Magistrate Judge